640 So.2d 882 (1994)
STATE of Louisiana
v.
Shawn A. POLLARD.
No. 93-KA-1960.
Court of Appeal of Louisiana, Fourth Circuit.
July 14, 1994.
*883 Harry Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for appellee.
Bruce G. Whittaker, New Orleans, for appellant.
Before BARRY, BYRNES and ARMSTRONG, JJ.
BYRNES, Judge.
Shawn Pollard appeals his convictions and sentences for distribution of cocaine and possession of cocaine in violation of LSA-R.S. 40:967, as well as his conviction and sentence as a third offender pursuant to LSA-R.S. 15:529.1. We affirm.
Upon receiving information about narcotic trafficking involving Pollard, on September 25, 1991 Detective Stephen Imbragulio and Officer Eric Hessler set up a surveillance of 1702 Joliet Street, alleged to be Pollard's residence, and an apartment building at 8500 Hickory Street, known as the Hickory Plaza apartments. The officers had a clear view of both locations, and occasionally enhanced their view with binoculars.
At approximately 2:10 in the afternoon, the officers observed the defendant Pollard and the co-defendant, John Roby, leave the residence on Joliet Street and walk to the Hickory Plaza apartments. They saw the two men meet three other men on bicycles and talk for a short time. Pollard and Roby then went back to 1702 Joliet Street, returning about twenty minutes later, where they again talked with the men on bicycles. The bicycle riders then rode away in different directions.
*884 At approximately 2:35 p.m., the officers saw a male approach Roby. An apparent narcotics transaction occurred. The officers saw the male hand John Roby currency; Roby took an object from his mouth and handed it to the other man, who then left. At the time of this activity, Pollard was sitting on some steps next to the apartment complex about fifteen feet away. The officers next saw a blue station wagon enter the block. The driver got out, walked over to Roby, exchanged currency for an object Roby took out of his mouth, and then returned to his vehicle and departed. Over the next twenty-five minutes, the officers observed three more narcotic transactions in which Roby exchanged currency from third parties for objects he took from his mouth.
During this period of the surveillance, the narcotics officers attempted to contact other police officers who could stop and search one of the people observed making a transaction and thereby verify that a narcotics purchase had occurred. At first no other officers were free to assist. Finally, Detectives Williams and Thomas radioed that they were on the way. Detectives Imbragulio and Hessler continued their surveillance, and at 3:10 p.m. they saw a heavy-set man dressed in a black shirt and brown pants enter the block. The man handed John Roby currency; Roby again reached in his mouth and removed an object which he passed to the man. During the transactions, Pollard had been either sitting on the steps or was standing by Roby. After Pollard engaged in conversation with Roby and the heavy-set man, Roby entered the apartment complex, out of sight of the officers, while Pollard stayed with the heavy-set man. A couple of minutes later, Roby returned and handed the heavy-set man another object. The heavy-set man then walked away.
Detectives Imbragulio and Hessler radioed the back-up detectives about what they had witnessed and asked them to stop the heavy-set man, whose name was later learned to be Johnny Moore. Detectives Joseph Thomas and Joel Williams stopped and searched Moore based on the description and information that they received by radio. They discovered one piece of crack cocaine in his left front pants pocket and a small quantity of marijuana in his rear pants pocket.
While Johnny Moore was being arrested, Detectives Imbragulio and Hessler continued their surveillance of Roby and Pollard. They observed John Roby return to the residence at 1702 Joliet Street; Pollard remained in front of the Hickory Plaza apartments. Different people approached Pollard during this time, but no drug transactions occurred, and the third persons left the area. After John Roby returned, the officers saw the defendant motion his hand across the street, although the officers could not see anyone to whom the defendant may have been signaling. The officers did see a male appear and approach John Roby. Another apparent narcotics transaction occurred. The male who engaged in the transaction with Roby had previously approached Pollard.
The detectives also observed two more narcotics transactions. At 3:55 p.m., approximately, they saw John Roby reach into his pocket and hand a wad of currency to Pollard. Pollard walked to 1702 Joliet while apparently counting the money. John Roby stayed in the area, engaging in a football game. The defendant returned a few minutes later.
After Detectives Thomas and Williams arrested the heavy-set man, Johnny Moore, they transported him to the Narcotic Annex Office where they completed necessary paperwork. They then returned to the area where the other officers were continuing surveillance. Detectives Thomas and Williams then arrested John Roby and Shawn Pollard, based upon descriptions provided by Detective Imbragulio, and at his request. A search of both men was negative for drugs or money.
After the defendant and John Roby were arrested, the detectives saw a man, who previously had spoken to the co-defendants on a bicycle. As he was going towards 1702 Joliet Street, the officers feared that the bicyclist was going to warn someone who might be at the residence so the detectives went to the house. Outside the house they encountered Denise Roby, wife of John Roby. Detective Imbragulio and Hessler asked about possible occupants of the house and were told that *885 only a small child was inside. Deciding to secure the house, the officers asked Mrs. Roby to remove a large dog from inside the house to the backyard. At first Ms. Roby was unable to do so. After Detectives Thomas and Williams took Roby and Pollard to the house, Pollard was also asked to get the dog out and was unable to do so. Mrs. Roby then pulled the dog out of the house by its collar.
The police and the defendants went into the house. Shawn Pollard was advised that he was under arrest for narcotics violations and that the officers intended to obtain a search warrant for the residence. Pollard advised the officers that he had some money in the house but that there were no narcotics or anything else there. The defendant signed a consent to search form, and then he led Detectives Hessler and Thomas to a back bedroom to show them where the money was. The officers retrieved what was described as a tin can or box from under a small bed; the can contained approximately $4,410 in currency. A subsequent search of the entire house led to the discovery and seizure of narcotics which were concealed inside a wicker basket that was hanging on the wall of the same bedroom where the money was found. The cocaine was inside a white Woolworth's bag, then further wrapped inside nine plastic bags, and further broken into individual pieces of rock cocaine each wrapped in a piece of plastic. The cocaine's total weight was approximately 124 grams.
The officers found a voter's registration card in the bedroom; it bore Shawn Pollard's name. A beeper was removed from the defendant as well. A scanner and a set of walkie talkies were also discovered in the house and seized.
Mary Williams, mother of the defendant Shawn Pollard, testified on his behalf. She stated that she resided at 1702 Joliet Street and had done so at the time of the defendant's arrest. Residing with her at the time was Denise Taylor, John Roby's wife, and her child. Ms. Williams testified that John Roby was not living with his wife because they were not getting along. Shawn Pollard was not living on Joliet Street either, according to his mother. He had stopped living there some months previously, and instead was residing on Roman Street with his girlfriend. Ms. Williams testified that Pollard would visit with her and occasionally received a piece of mail at her home. She also stated that she was a United States Mail contractor, hauling mail to different cities, and as a part of that business she received payment by check in amounts varying from approximately $2,000 to over $7,000. Payment stubs were introduced to verify this testimony. Ms. Williams identified the box with the currency that was found in her home as her own. She stated that she needed large sums of cash for her business, which required her to wire money to different cities to meet her payroll and for repairs when a truck would break down. Ms. Williams further identified the scanner found in her home as belonging to a male friend who operated a tow truck. She stated that the beeper found on Shawn belonged to her and was necessary for her business.
Shawn Pollard, and his co-defendant, John Roby, were charged with distribution of cocaine and possession of cocaine in the amount of 28 grams or more, but less than 200 grams, both violations of LSA-R.S. 40:967. They were also charged with one count of distribution of marijuana. The defendant Pollard entered pleas of not guilty on November 6, 1991 and the defense's motion to suppress was denied on February 12, 1992. The trial court later granted a severance of the defendants.[1] The defendant Pollard proceeded to trial on March 9, 1993. The twelve-person jury returned verdicts of guilty as charged on the first two counts and not guilty on the third count of distribution of marijuana.
After ordering a presentence investigation, the trial court sentenced the appellant to ten years on count one, relative to distribution of cocaine, and ten years without the benefit of probation, parole, or suspension of sentence on count two, for possession of cocaine, *886 with the sentences running consecutively. The State subsequently filed a multiple bill as to count two, charging the appellant with being a third offender. At a hearing on the multiple bill hearing held on July 2, 1993, the trial court found the defendant Pollard to be a third offender based on the following prior convictions: (1) Case No. 324-835, Section "B", for possession of stolen property on March 25, 1988; (2) Case No. 338-817, Section "J", for possession of cocaine on July 24, 1991; and (3) Case No. 352-972, Section "A", for possession of cocaine on March 9, 1993. The trial court sentenced the defendant to ten years under the multiple bill to run consecutively to the previous ten year sentence imposed for possession of 28 to 200 grams of cocaine, for a total sentence of twenty years. The trial court further ordered that the sentence imposed on count one run concurrently with the twenty year sentence imposed under the multiple bill. The defendant Pollard's appeal followed.

ERRORS PATENT
The sentence imposed contains three errors patent. In the first patent error, the trial court failed to impose a fine as required by LSA-R.S. 40:967 F(a).[2] Additionally, upon resentencing the defendant as a multiple offender, the trial court failed to state that the defendant would not be eligible for parole, probation, or suspension of sentence prior to serving the minimum sentence as is required by LSA-R.S. 40:967 G. However, considering that the state did not object at the time of sentencing, did not file a timely motion to reconsider the sentences, and did not appeal, this court is prohibited from reviewing the issue of an illegally lenient sentence. LSA-C.Cr.P. arts. 881.1, 881.2(B)(2), and 882; State v. Noel, 585 So.2d 652 (La. App. 4th Cir.1991); State v. Washington, 621 So.2d 114 (La.App. 2d Cir.), writ denied 626 So.2d 1177 (La.1993).
Another patent error exists with regard to the sentence on count two. When the trial court resentenced the defendant as a multiple offender, it stated:
... So it is the sentence of the Court that you be placed in the custody of the Department of Corrections as a Multiple Offender for a period of twenty years sir.
* * * * * *
Let the record reflect that the maximum that the defendant could have received on the triple bill was sixty years; the minimum was twenty years.
The Court is going to vacate the sentence imposed against the defendant on the initial Bill of Information, charging him with possessing 28 to 200 grams of cocaine.
The Court is going to order that the ten year sentence imposed against the defendant is ordered to run consecutive to the ten years imposed against the defendant for possession of 28 to 200 grams in the Bill of Information charging him in this Court, 352-972. The Court would allow the ten-year sentence imposed on distribution of cocaine as a result of his conviction, after a Jury Trial (sic), to run concurrent with the twenty years imposed on the Multiple Bill this date.
The minute entry of sentencing repeats the sentencing scheme enunciated by the trial court. Initially, the trial court correctly imposed a twenty-year sentence under LSA-R.S. 15:529.1 after the trial court vacated the initial sentence as is required by the habitual offender statute. However, the court then added a ten-year sentence under LSA-R.S. 15:529.1 to the original, vacated, ten-year sentence. Clearly, the trial court intended for the defendant to serve a total of twenty years on count two as a multiple offender, and the trial court imposed that sentence correctly. Any error in the trial court's subsequent reference to the twenty-year sentence as two ten-year consecutive terms is then clarified in the trial court's additional subsequent statement that the ten year sentence on distribution of cocaine on count one is to run concurrently with the twenty year sentence imposed on the multiple bill. At the multiple bill hearing, the trial court was *887 aware that the minimum sentence on the triple bill was twenty years.

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant contends that the trial court erred when it denied the motion to suppress the evidence. The defendant's argument is that the consent to search the residence was tainted by an arrest of the defendant on grounds less than that required to establish probable cause.
The defendant consented to a search of the residence after he was placed under arrest. However, the officers, after arresting the defendant, had proceeded to the residence to "secure" it while they obtained a search warrant. It was after they entered the residence that they obtained the defendant's consent to the search, obviating the need for the warrant. It is apparent that whether the police had arrested the defendant or not, they were going to obtain a search warrant for the residence at 1702 Joliet Street.
In State v. Knapper, 626 So.2d 395, 396 (La.App. 4th Cir.1993), writ denied 630 So.2d 798 (La.1994), this court stated:
In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the "inevitable discovery" doctrine, holding that evidence found as a result of a violation of a defendant's constitutional rights, would be admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered." The so-called "inevitable discovery doctrine" has been followed by Louisiana courts. State v. Nelson, 459 So.2d 510 (La.1984), cert. den., Nelson v. Louisiana, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985); State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986).
Under the "inevitable discovery doctrine", in Knapper this court found that the facts were sufficient to establish probable cause that there were drugs or evidence in the residence, and the officers would have received a search warrant.
In the present case, the officers had been informed by a reliable confidential informant that there was a narcotics operation in the 8500 block of Hickory Street and that the operation was controlled by the defendant. Specifically, the information was that the defendant or one of his runners would bring small amounts of crack cocaine from his house on Joliet Street, sell until their supply was exhausted, return to the house to put away the profits and obtain more drugs, then return with more cocaine to sell. The officers had previously served a search warrant on the Joliet Street house and were familiar with the defendant. Their observations on the date of the defendant's arrest confirmed the tip provided by the confidential informant. Based on the totality of the circumstances, the reliable confidential informant's tip and the observations of the officers were sufficient to establish probable cause that there was evidence or contraband in the residence at 1702 Joliet Street. Because the police officers had probable cause to obtain a search warrant, it is not necessary to determine whether the defendant's consent to the search of the residence was tainted.
The appellant's first assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, the appellant contends that the evidence was insufficient to support the jury's verdicts. He argues that the State failed to prove beyond a reasonable doubt that he was in actual or constructive possession of the cocaine found in the residence. He claims that the observations of the police officers showed that only John Roby directly engaged in narcotic trafficking.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). When the conviction is based upon circumstantial evidence, such evidence must exclude every reasonable *888 hypothesis of innocence. LSA-R.S. 15:438; State v. Camp, 446 So.2d 1207 (La.1984). This is not a stricter standard of review, but it is an evidentiary guide for the jury when it considers circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985). If a case involves circumstantial evidence, and a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails; and unless another one creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La.1984).
To support a conviction of possession of drugs with intent to distribute, the State must prove that the defendant knowingly or intentionally possessed the narcotic and that he did so with the intent to distribute it. State v. James, 581 So.2d 349 (La. App. 4th Cir.1991). Neither the mere presence of the defendant in an area where drugs have been found nor the mere fact that he knows the person in actual possession is sufficient to prove constructive possession. State v. Bell, 566 So.2d 959 (La.1990). Additionally, being a resident of the premises where drugs are found is not in and of itself sufficient to prove constructive possession. State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991). Nevertheless, a person found in the area of the contraband can be considered in constructive possession if it is subject to his dominion and control. State v. Trahan, 425 So.2d 1222 (La.1983). The defendant can have constructive possession if he jointly possesses the drugs with a companion and if he willfully and knowingly shares with his companion the right to control of the drugs. State v. Hookfin, 601 So.2d 320 (La.App. 4th Cir.1991), writ denied in part, granted in part & remanded 596 So.2d 536 (La.1992).
The following factors should be considered in determining whether the defendant exercised dominion and control so as to constitute constructive possession: the defendant's knowledge that illegal drugs were in the area; the defendant's relationship with the person in actual possession; the defendant's access to the area where the drugs were found; evidence of recent drug use; the defendant's proximity to the drugs; and any evidence that the area was frequented by drug users. Bujol v. Cain, 713 F.2d 112 (5th Cir.1983) certiorari denied 464 U.S. 1049, 104 S.Ct. 726, 79 L.Ed.2d 187 (1984); State v. Hookfin, supra.
Regarding the element of intent to distribute, the State must prove specific intent to distribute. State v. Roberts, 550 So.2d 1254 (La.App. 4th Cir.1989), writ denied 558 So.2d 599 (La.1990). Specific intent can be inferred from the circumstances of the transaction. State v. Myre, 502 So.2d 1105, 1108 (La.App. 4th Cir.1987), set forth the factual circumstances that would support an inference of intent to distribute:
... Factual circumstances from which the intent to distribute a controlled dangerous substance may be inferred include: previous distribution or attempted distribution by the defendant; the presence of paraphernalia for distribution; possession of an amount sufficient to create a presumption of intent to distribute; and packaging in a form usually associated with distribution rather than personal use. State v. House, 325 So.2d 222 (La.1975); State v. Benton, 464 So.2d 960 (La.App. 4th Cir.1985).
LSA-La.R.S. 14:24 defines principals as: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime...." See State v. Brooks, 505 So.2d 714 (La.1987), certiorari denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Watson, 529 So.2d 94 (La.App. 4th Cir.1988), writ denied 535 So.2d 740 (La.1989). To support a defendant's conviction as a principal, the State must show that the defendant had the requisite mental state for the crime. Brooks, supra; State v. Spotville, 583 So.2d 602 (La. App. 4th Cir.1991), writ denied, 585 So.2d 577 (La.1991). Distribution of cocaine requires only general intent, and such intent is established by mere proof of voluntary distribution. State v. Chatman, 599 So.2d 335 (La.App. 1st Cir.1992). A defendant may be guilty as a principal in the crime of distribution if he aids and abets in the distribution or *889 indirectly counsels or procures another to distribute the controlled dangerous substance. State v. Parker, 595 So.2d 765 (La. App. 4th Cir.1992).
In State v. Parker, 627 So.2d 210 (La.App. 4th Cir.1993), writ denied, 634 So.2d 403 (La.1994), this court found insufficient evidence to prove the intent to distribute cocaine where Parker's role was limited to examining the cocaine during one transaction between Albert Jones and an undercover agent.
In the present case the officers observed the defendant and John Roby leave the Joliet Street address together and talk to some men on bicycles. Roby and Pollard went back to 1702 Joliet Street and then returned to the front of the Hickory Plaza apartments. Pollard was present during the entire time that several drug transactions took place. Pollard conversed with the various subjects who gave money to Roby for small objects. In particular, during the afternoon, when Roby went into the complex, Pollard stayed with the heavy-set subject, Johnny Moore, until Roby returned and completed the transaction. Later Pollard signaled, and a male appeared, approached Roby, and another transaction occurred. After the last transaction that afternoon, Roby handed money to Pollard, who went back to 1702 Joliet Street while Roby played football.
Although Mrs. Williams testified on behalf of her son Pollard, and stated that Pollard no longer lived with her but occasionally received mail at her house at 1702 Joliet, the record shows that Pollard had access to her Joliet Street home and left and returned to that address during the afternoon.[3] Ms. Williams testified that she kept the large amount of cash, as well as scanner, walkie talkies and the beeper for her business as a long distance carrier for the United States mail. However, prior to trial, Ms. Williams did not notify the police or the district attorney's office to make a claim that the money or other seized items belonged to her.
Detective Imbragulio testified that when Pollard signed the form giving his consent to search 1702 Joliet Street, he stated that he had money in the house. When he consented to search the premises, the defendant did not declare that he did not have the power to give permission to the search because he did not live there. When defense counsel questioned Detective Hessler, the officer agreed that Pollard said he had money in the house. Detective Thomas testified that Pollard, "made a comment or two about having an amount of money under his bed or in a bedroom in the back room, I remember him saying something about a bedroom in the back room he had money." Considering that the officers continued their surveillance of Roby and Pollard, the fact that Pollard and Roby had no money when searched indicates that the money from the drug transactions which was transferred from Roby to Pollard, was in the tin box under the bed, to which Pollard directed the police officers. No other money was recovered. When he was searched, Pollard had a beeper on him. Walkie-talkies were found under the bed. A scanner was recovered. These items, as well as the fact that the cash was in small denominations, are consistent with and indicative of drug distribution. The large quantities of crack cocaine were located in a wicker basket on the wall in the bedroom in close proximity to the money. The small rocks of cocaine were individually wrapped, further indicating evidence consistent with drug distribution.
Under the totality of circumstances, considering that the piece of crack cocaine recovered from Johnny Moore was wrapped identically to the crack cocaine found in the bedroom; that Pollard was present throughout all of several transactions; that he received money from Roby; that he admitted that he had money in the house showing that he had access, dominion and control of that area of the house in close proximity to where *890 the large amount of cocaine was located; that he led the officers to the only money recovered from the search of the house or from the co-defendants; as well as the other evidence consistent with drug trafficking; viewed in the light most favorable to the prosecution, any rational finder of fact could conclude that the evidence indicated that Pollard had access and control of the large amount of money and crack cocaine, and that Pollard was a principal in the distribution of crack cocaine. The evidence is sufficient to prove every essential element of the offense of possession of cocaine, as well as the offense of intent to distribute cocaine.
As discussed previously, the trial court properly found that Pollard was a third offender. Accordingly, the convictions and sentences of the defendant are affirmed.
AFFIRMED.
NOTES
[1] The co-defendant, John Roby, later entered a guilty plea to the distribution charge. The state nolle prossed the possession of cocaine charge.
[2] R.S. 40:967 F(a) provides that the penalty for possession of more than 28 grams but less than 200 grams of cocaine shall be "a term of imprisonment at hard labor of not less than five years, nor more than thirty years, and to pay a fine of not less than fifty thousand dollars, nor more than one hundred fifty thousand dollars."
[3] The defense attempted to infer that Pollard did not have control over the house because he could not control the dog in the house. The record shows that although the dog did not obey the commands of Denise Roby and Pollard, Denise Roby finally held the dog's collar and took the dog out of the house. Mrs. Williams testified that she owned her dog Stacy for 11 years. Therefore, Pollard, who, according to his mother, had moved out of the house a few months before September 25, 1992, would have been just as familiar with the dog as Denise Roby was.