828 So.2d 1173 (2002)
STATE of Louisiana
v.
Lawrence CLARK.
No. 2001-KA-2087.
Court of Appeal of Louisiana, Fourth Circuit.
September 25, 2002.
*1175 Harry F. Connick, District Attorney, Scott Peebles, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Kevin V. Boshea, New Orleans, LA, for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR.
WILLIAM H. BYRNES III, Chief Judge.
STATEMENT OF THE CASE
Defendant Lawrence Clark Jr. was charged by grand jury indictment on July 22, 1999 with one count of possession with intent to distribute heroin, a violation of La. R.S. 40:966(A), one count of possession with intent to distribute marijuana, a violation of La. R.S. 40:966(A), and possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. Defendant pleaded not guilty at his August 9, 1999 arraignment. The trial court denied defendant's motion to suppress the evidence on February 29, 2000. On April 18, 2000, he filed a writ application with this Court which was denied, complaining of the denial of his motion to suppress.[1] Defendant proceeded *1176 to trial by a twelve-person jury on the two drug counts on May 14-16, 2001, and was found guilty of possession of heroin and attempted possession of marijuana. On July 6, 2001, the trial court sentenced defendant to serve four years at hard labor as to the heroin count and three months on the marijuana count, the sentences to run concurrently. The State filed a habitual offender bill of information on August 15, 2001. An undated docket master reflects that the State withdrew this habitual offender bill of information and filed a new one on June 7, 2002. As of July 12, 2002, the habitual offender hearing was set for August 16, 2002. The trial court granted defendant's motion for appeal on an unknown date prior to September 13, 2001.
FACTS
Dominic Imbornone, a Jefferson Parish Deputy Sheriff at the time of trial, testified that in late May, 1999 he was employed as a New Orleans Police Officer. In that capacity, he and his partner, Officer Daniel Scanlan, initiated an investigation based upon information they had received. On June 1, 1999, Officer Imbornone observed a white Mitsubishi Montero leave 8201 Palm Street, being driven by defendant. Defendant, with one passenger inside, headed toward Carrollton Avenue at a high rate of speed, driving in an erratic manner. Officers Imbornone and Scanlan, in a fully-marked patrol car, eventually stopped the car at South Broad Street and Washington Avenue for a traffic violation. It was approximately 9:30 p.m.
The officers exited their patrol car and approached the vehicle on different sides. Officer Imbornone, on the passenger side, observed defendant looking toward his rear view mirror and fumbling with something around the center console of the vehicle. The vehicle's backup lights came on, and it backed up towards the officers, ramming the patrol car. At that point Officer Imbornone drew his service weapon, opened the passenger door, and ordered the passenger out. As the passenger was exiting, Officer Imbornone observed defendant taking what appeared to be small packages of clear plastic from the center console and placing them into his mouth. Officer Imbornone alerted Officer Scanlan, and proceeded to handcuff the passenger. He looked up and noticed that Officer Scanlan and defendant were no longer in sight. Fearing for the safety of Officer Scanlan, Officer Imbornone ran to the front of the subjects' vehicle to see the defendant rise to his feet and flee toward South Johnson Street. Officer Scanlan was on the ground. Officer Imbornone chased and caught defendant. Officer Scanlan came to assist, and both officers wrestled with defendant. Officer Imbornone had to pepper spray defendant. At one point defendant was on the ground ripping open bags of white powder. Defendant was finally handcuffed after backup officers arrived to assist. The passenger was never apprehended.
Deputy Imbornone identified at trial evidence the officers recovered at the scene, including ripped-open plastic bags containing what he believed to be heroin residue. The officers looked into the glove box of the suspect's vehicle, where they discovered a utility bill in defendant's name, with an address of 8201 Palm Street, Apartment 242. The officers went to that address to secure it, pending the issuance of a search warrant. Deputy Imbornone was not really certain what time they arrived at the apartment, but believed it was approximately 10:00 p.m. No one answered the door, but they were able to ascertain that it was defendant's apartment. Officer Scanlan broke a window pane to gain access to the apartment. The officers determined *1177 that no one was inside, and waited for a search warrant.
Deputy Imbornone identified one hundred grams of heroin that were recovered from the apartment in his presence during a subsequent search. The deputy identified a coffee grinder containing heroin residue, and a clear plastic bag containing approximately sixty grams of a greenish vegetable matter that he personally recovered from a dresser drawer in the bedroom. Numerous items were also recovered from the apartment: four boxes of clear cellophane bags, often used to package contraband; Mannitol powder, often used to cut/dilute street drugs; scales; a loaded handgun retrieved from the nightstand; boxes of .380 and 9mm ammunition; a strainer and spoon with white powder residue; a small clear cellophane bag containing a small amount of heroin; aluminum foil, recovered from the kitchen; a small business card for Blair's Bail Bonding, that had a white powder residue on it; a plate with a white powder residue on it; a photograph of defendant taken in the apartment; a municipal court bill in defendant's name; and other documents with defendant's name on them. Eighteen thousand five hundred dollars ($18,500) in currency was recovered from a closet. One thousand three hundred twenty-four dollars ($1,324) was recovered from defendant's right pants pocket.
Deputy Imbornone confirmed on cross examination that a police report he was shown reflected that the search warrant was obtained at 3:15 a.m. The deputy was shown four tags on items of evidence reflecting that they were confiscated at approximately 9:30 p.m. on June 1. Deputy Imbornone testified on redirect examination that the 9:30 p.m. time corresponded to the time of the stop.
New Orleans Police Sergeant Daniel Scanlan's testimony was similar to that of Deputy Imbornone, his partner on the evening of June 1, 1999. Sgt. Scanlan observed the white Mitsubishi Montero defendant was driving in the 8200 block of Palm Street, outside of the Carrollton Park Apartments. It "took off" when they caught up to it. Sgt. Scanlan observed defendant putting things in his mouth. The vehicle backed up and rammed the police car. Sgt. Scanlan opened the driver's side door and grabbed defendant, who was reaching for the center console of the vehicle. Defendant knocked Sgt. Scanlan back, and the two scuffled on the street. Deputy Imbornone joined in, and defendant broke free and ran. After he was caught, defendant flipped Sgt. Scanlan over his shoulder, causing the sergeant's gun to fall from its holster. As the defendant moved to retrieve the gun, Sgt. Scanlan hit him with his radio and Deputy Imbornone pepper sprayed the defendant.
Sgt. Scanlan identified baggies that defendant had in his mouth when apprehended. He identified the utility bill found in the vehicle, listing defendant Lawrence Clark's address as 8201 Palm Street, Apartment 242. Sgt. Scanlan testified that upon entry into the apartment the officers simply secured the apartment, checking to see whether anyone was inside, and did not search for evidence until after he obtained the search warrant. Sgt. Scanlan identified the one hundred grams of heroin that was recovered and the baggy containing fifty-seven grams of marijuana, as well as the other evidence.
Sgt. Scanlan conceded on cross examination that the only contraband found at the scene of the stop and apprehension was the torn-up pieces of plastic with heroin residue in them. The sergeant was confronted with the fact that none of the photographs taken by an officer at the scene showed any white powder on the street. He explained that the photographs *1178 were taken after the evidence had been collected. Sgt. Scanlan stated at one point that the stop of defendant's vehicle was "never a traffic stop purely at all." He identified a copy of a traffic citation issued to defendant for reckless operation of a motor vehicle. Sgt. Scanlan explained that more than one item of drugs might be tagged 9:32 p.m. because there is only one space on the form for a time, but he also explained that the times and locations that different items of evidence were recovered appears in the report.
Sgt. Scanlan was confronted on cross examination with his prior testimony from another hearing that defendant managed to eat all of the powder that was in the plastic bags in his mouth, but that the bags still had residue on them. This conflicted with testimony at trial that he couldn't eat it all and that some fell to the ground. Sgt. Scanlan was asked on redirect examination whether he had any idea how much heroin was in the baggies before defendant put them in his mouth, how much spilled into the street or how much he swallowed, all questions to which he responded in the negative.
Lt. Reginald Jacques was qualified as an expert in the field of the packaging of controlled dangerous substances for retail sale. His testimony was directed to establishing that defendant was a drug dealer, and that everything in his apartment, the drugs recovered, the paraphernalia and the two guns were consistent with possession with intent to distribute heroin and marijuana.[2]
Warren Spears, evidence room supervisor at the Criminal District Court for the Parish of Orleans, identified a control sheet for the instant case reflecting that a sealed package containing $19,824 in currency was received by his office from police. He said the currency had disappeared.
New Orleans Police Detective Byron Corley, assigned to the asset forfeiture section, counted more than nineteen thousand dollars in currency purportedly seized from defendant. It was then placed in a sealed evidence bag and deposited in the police evidence and property room.
New Orleans Police Crime Lab Criminalist Glenn Gilyot, qualified by stipulation as a criminalist, testified that the white powder residue on the coffee grinder seized from defendant's apartment was heroin; that vegetable matter in a plastic bag recovered from defendant's apartment was marijuana; that the residue on five open pieces of plastic bags recovered by police at the scene of defendant's arrest was heroin; that the white compressed substance seized from defendant's apartment was heroin; and that the white powder in a small plastic bag seized from defendant's apartment was heroin.
New Orleans Police Sergeant Dwayne Scheuermann responded to the scene of defendant's arrest on an officer-needs-assistance radio call. Defendant and Sgt. Scanlan were injured. Sgt. Scheuermann, who became the supervisor once he arrived at the scene, called for an EMT team, particularly because he had been advised defendant had ingested heroin. At the scene, Sgt. Scheuermann was shown some bags with residue that appeared to have been chewed. He testified that, based on the evidence, he believed the officers had probable cause to secure defendant's apartment. No one searched the apartment for contraband until the search warrant was obtained. Sgt. Scheuermann *1179 identified the items of evidence seized from the apartment. Sgt. Scheuermann stated that defendant's mother showed up at the apartment, and they let her secure it after completing their search. Also, two other individuals came to the apartment, LaShonda Francis and Edmond Fontaine. Sgt. Scheuermann recalled that they came to see defendant, and were told he was under arrest.
Sgt. Scheuermann read part of his police report on cross examination, stating that a canine searched defendant's vehicle but found no narcotics. He conceded that of the documents seized from defendant's glove compartment, more of them bore an Apricot Street address than the Palm Street address. Sgt. Scheuermann said there was no reason to lift fingerprints from the Palm Street apartment. He did not review the lease agreement. Sgt. Scheuermann testified that the Apricot Street address was the address of defendant's mother.
LaShonda Francis testified that on the night of June 1, 1999, she went to an apartment on Palm Street, although she did not recall the address. When asked who lived there, Ms. Francis said someone named Carla, a woman who braided her hair. She noticed a broken window pane. She looked into the apartment through a window to see two police officers holding up a box spring and mattress. This was between 10:15 and 10:30 p.m. Ms. Francis said Sgt. Scheuermann approached her and Carla's uncle, who had walked up, and asked for identification. The officer asked her if she was looking for Lawrence Clark. She replied in the negative, stating that she was looking for Carla.
Matthew Short identified a gun found in defendant's apartment as belonging to him. He said he left the gun with Carla Rogers at 8201 Palm Street, Apartment 242. Defendant was not present at that time. Short did not know defendant personally, but recognized him from seeing his photograph in Carla's apartment. Short said he did not know whether defendant lived at the apartment.
ERRORS PATENT
A review of the records reveals no errors patent.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant clams that the evidence was constitutionally insufficient to support his conviction.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; *1180 Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant specifically argues that the evidence is insufficient to establish his constructive possession of any of the items found at the Palm Street apartment. Defendant further argues that because the baggies recovered at the time of his arrest contained only heroin residue, and the testimony of Sgt. Scanlan was suspect, his guilt as to the baggies is at best "probable," and thus insufficient.
To convict for possession of a controlled dangerous substance, the State must prove that the defendant knowingly possessed it. State v. Handy, XXXX-XXXX, p. 4 (La.App. 4 Cir. 1/24/01), 779 So.2d 103, 104, writ denied, XXXX-XXXX (La.3/28/02), 812 So.2d 651; State v. Lewis, 98-2575, p. 3 (La.App. 4 Cir. 3/1/00), 755 So.2d 1025, 1027. Guilty knowledge is an essential element of the offense of possession of a controlled dangerous substance. State v. Ricard, 98-2278, p. 7 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Knowledge need not be proven as facts, but may be inferred from the circumstances. State v. Porter, 98-2280, p. 3 (La.App. 4 Cir. 5/12/99), 740 So.2d 160, 162. The State need not prove that the defendant was in actual possession of the narcotics found; constructive possession is sufficient to support conviction. State v. Robinson, 99-2236, p. 5 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 970, reversed on other grounds, XXXX-XXXX (La.5/17/02), 817 So.2d 1131. Simply being a resident of premises where drugs are found is not in and of itself sufficient to prove constructive possession. State v. Hodge, XXXX-XXXX, p. 5 (La.App. 4 Cir. 1/17/01), 781 So.2d 575, 580, writ denied, XXXX-XXXX (La.1/25/02), 806 So.2d 666; State v. Pollard, 93-1960, p. 12 (La. App. 4 Cir. 7/14/94), 640 So.2d 882, 888.
A utility bill addressed to defendant at 8201 Palm Street, Apartment 242, was found in defendant's vehicle. In addition, Sgt. Scheuermann also testified that defendant's mother came to the apartment, and that the officers turned it over to her to secure it when they finished their search. Defendant points out that Sgt. Scheuermann conceded on cross examination that the majority of the documentation found in defendant's vehicle with the utility bill listed an address on Apricot Street. However, there was no evidence what name was on this Apricot street documentation. Sgt. Scheuermann testified that the Apricot Street address was the residence of defendant's mother.
Deputy Imbornone identified a municipal court bill bearing defendant's name *1181 that was found in the Palm Street apartment. Deputy Imbornone testified that numerous items of men's clothing were found in the apartment, as well as some women's clothing. He said there was more men's clothing than women's. Sgt. Scanlan testified that the apartment had only one bedroom. The marijuana seized was recovered inside of a dresser in that bedroom, and from a plate that was sitting on a table at the foot of the bed in that bedroom.
LaShonda Francis testified that she went to the Palm Street apartment while police were there. Sgt. Scheuermann confirmed that she did come to the apartment. However, Ms. Francis testified that she went there to see "Carla," a woman who braided her hair. She claimed that when police asked her if she had come to see Lawrence Clark, she replied that she had come to see Carla, while Sgt. Scheuermann testified that he recalled that Ms. Francis was looking for defendant. Matthew Short testified that he had left a gun seized at the apartment that was seized by police. He said he left it with Carla Rogers, and that defendant was not present in the apartment at that time. Short did not know defendant personally, but recognized him from seeing his photograph in Carla's apartment. Short said he did not know whether defendant lived at the apartment.
Heroin was recovered in the Palm Street apartment. The bulk of the heroin was in a compressed form, but the apartment contained a coffee grinder with heroin dust on it, that apparently was used to grind up the compressed heroin into powder. Five heroin-dusted plastic baggies were recovered when defendant was stopped minutes after he was seen driving away from the Palm Street apartment complex. This contraband was recovered after defendant had desperately fought with two police officers while ripping open the baggies and either consuming the powdered heroin inside or scattering it about so that it could not be recovered. Sgt. Scanlan indicated that the torn plastic baggies recovered at the scene of defendant's arrest matched the baggies recovered from inside of the Palm Street apartment. Four boxes of those small baggies were recovered from the apartment, along with numerous items of paraphernalia including scales and a powdered substance commonly used to dilute heroin for retail sale.
Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant had a strong connection to the Palm Street apartment, that he knew the heroin and marijuana were there, and that he exercised dominion and control over the drugs, thus constructively possessing them. Therefore, the evidence was sufficient to convict him of the offenses for which he was convicted possession of heroin and attempted possession of marijuana, both legislatively-provided responsive verdicts to the charged offenses of possession with intent to distribute heroin and possession with intent to distribute marijuana.
There is no merit to this assignment of error.
ASSIGNMENTS OF ERROR NOS. 2, 6 & 7
Defendant presents no argument with regard to his Assignments of Error Nos. 2, 6 & 7. "Any specification or assignment of error not briefed is considered abandoned." State v. Mims, 97-1500, p. 59 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 80, quoting State v. Anderson, 97-2587, 9-10 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 20. See also Rule 2-12.4, Uniform Rules of Louisiana Courts of Appeal.
Accordingly, these three assignments of error are deemed abandoned.
*1182 ASSIGNMENTS OF ERROR NOS. 3, 4, 5 & 8
In these assignments of error, which defendant addresses in one argument, he complains that the trial court erred in denying four of his numerous motions for mistrial. However, defendant presents no argument concerning the remedy of mistrial per se. Defendant argues that the errors which prompted his objections and motions for mistrialreferences to alleged crimes and improper argument by the prosecutorconstitute reversible error, but he fails to brief any argument tending to show that the proper remedy for these alleged errors is a mistrial. Therefore, the defendant is deemed to have abandoned[3] any complaint he may have concerning the failure of the trial court to grant him a mistrial. However, this Court will now give full consideration to the defendant's arguments concerning reversible error.
Defendant first cites testimony by Sgt. Scanlan. Sgt. Scanlan was asked how he initiated his narcotics investigation, and he replied that he was made aware of some possible narcotics, before being interrupted by an objection that was sustained. When subsequently asked how he initiated the sequences that led up to defendant's arrest, Sgt. Scanlan replied that he observed a vehicle he had been looking fora white Montero. Again, defendant timely lodged an objection that was sustained. Defendant characterizes these references as evidence of another crime or bad act committed by defendant as to which evidence was inadmissible. Defendant cites no authority holding that such comments were inadmissible references to another crime or bad act. For a remark or comment to justify a mistrial, it must constitute an unambiguous reference to other crimes. State v. Lewis, 95-0769, p. 7 (La.App. 4 Cir. 1/10/97), 687 So.2d 1056, 1060. Even assuming these vague comments prejudiced defendant to some extent, any error was harmless, as the evidence was considerable. The jury verdict was surely unattributable to these comments by Sgt. Scanlan. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845; State v. Vale, 96-2953, p. 2 (La.9/19/97), 699 So.2d 876, 877.
Defendant's brief states that: "In another part of the trial, Det. Byron Corley told the jury that he `interviewed' the defendant." However, the defendant's brief fails to explain why this testimony was prejudicial or why it should constitute reversible error. Det. Corley, assigned to the asset forfeiture division of the New Orleans Police Department, was asked on cross examination whether the only information he received was from officers who went to the scene. In his reply, Officer Corley indicated that he received information from the officers, and from the defendant during an interview. Co-defense counsel moved for a mistrial on the ground that this comment infringed defendant's Fifth Amendment right against self-incrimination. Det. Corley's brief, unadorned comment giving no indication of the content of the interview did not infringe defendant's right against self-incrimination, nor did it refer to other crimes or bad acts.
The rest of defendant's argument refers to alleged improper argument. The first complaint concerns the prosecutor's reference during rebuttal argument to how many retail doses of heroin could have been made from the heroin seized from the Palm Street apartment. At one point the prosecutor said, "that is two thousand needles sticking out of two thousand arms *1183 sitting right there." Defense counsel objected, but the objection was overruled.
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La. 1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Williams, supra; Ricard, supra.
In making the "two thousand-needle" comment in the instant case, the prosecutor was illustrating for the jury the societal impact of the retail distribution of the heroin found in defendant's constructive possession. Even assuming this argument exceeded the scope of permissible argument, one would not be "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. Recognizing the good sense and fair-mindedness of the jurors who heard the evidence, it cannot be said that this comment constituted reversible error.
Defendant next complains of the prosecutor's statement referring to defense counsel's closing argument in which defense counsel commented that reasonable doubt existed because three out of the six police officers involved in the case "were selling marred [sic] and money [sic] by this putrid investigation and scam, leaving the force." In rebuttal, the prosecutor said that if one wanted to talk about what was rotten and what was putrid, this was the jury's chance, because had it not been for the officers the drugs would have come "pouring" into the streets. Defense counsel objected, and the objection was sustained. The prosecutor continued, telling the jury that this was its chance to say no, that this is not acceptable and that drugs "will not go on in my city, in my community, in my schools." Again, defense counsel's objection was sustained.
Applying the previously discussed standards, there is no indication that the jury verdict was not based on the evidence, and there is no indication that the jury was inflamed to mete out lynch-mob justice and convicted the defendant out of passion, not reason, because of these comments.
Defendant next complains of comments the prosecutor made early in its rebuttal that the life sentence defendant was facing was nothing compared to the life sentence of people who ingest "this poison," and that there was a ninety-five percent failure rate for addicts attempting to kick their habits. Defense counsel's objections were overruled. Had defendant been convicted of possession of heroin as charged, he would have faced a mandatory *1184 life sentence. The jury in the instant case returned a verdict of simple possession of heroin as to that count, and defendant received a four-year sentence. It may very well have been that the prosecutor's repeated reference to the life sentence in his argument caused the jury to convict defendant only of possession. One thing is certainin spite of the prosecutor's references to a life sentence, the jury did not convict the defendant of a crime carrying a potential life sentence. Even assuming the comments were improper, crediting the good sense and fair-mindedness of the jury, one would not be thoroughly convinced that the comments influenced the jury and contributed to the verdict to defendant's prejudice. Thus, any error was harmless.
In concluding his argument as to these assignments of error, defendant submits that even if one might view each instance in isolation as harmless error, the cumulative effect was not harmless. This court has carefully examined each of the errors alleged by the defendant and found them to be without merit. Just as the Louisiana Supreme Court rejected the same argument in State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239 and State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154, this Court now rejects defendant's argument on this assignment of error.
ASSIGNMENT OF ERROR NO. 9
In this assignment of error, defendant asserts that the trial court erred in permitting the playing of what he characterizes as a 911 tape. The State played a tape recording of what Sgt. Scanlan identified as Deputy Dominic Imbornone's code 10-55 officer-needs-assistance radio call from the night in question. The tape was played during Sgt. Scanlan's testimony, and during the State's closing argument.
Defendant argues on appeal that the tape recording was irrelevant, and that therefore the trial court erred in admitting it. However, the record contains no objection to the playing of the tape itself. During the first playing of the tape, defense counsel objected on the ground of lack of a proper foundation. The trial court effectively sustained the objection, and the State laid a foundation.
La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; also State v. Dean, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/14/01), 789 So.2d 602, 607, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 897 ("As the defendant's argument on appeal is different from his basis for objecting at trial, the defendant is precluded from raising the issue on appeal.").
Defendant failed to preserve for review any claim that the trial court erred in permitting the tape to be played because it was irrelevant.
There is no merit to this assignment of error.
DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] State v. Clark, unpub., XXXX-XXXX (La.App. 4 Cir. 4/18/00) ("Relator has an adequate remedy on appeal."), writ denied, XXXX-XXXX (La.6/16/00), 765 So.2d 343.
[2] Deputy Imbornone was shown only one gun for identification, although two were apparently recovered.
[3] Uniform RulesCourts of Appeal, 2-12.4.