996 So.2d 571 (2008)
STATE of Louisiana
v.
James W. CAMPER.
No. 2008-KA-0314.
Court of Appeal of Louisiana, Fourth Circuit.
October 1, 2008.
*574 Keva Landrum-Johnson, District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for the State of Louisiana.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD, Judge PAUL A. BONIN).
EDWIN A. LOMBARD, Judge.
The defendant, James W. Camper, appeals his conviction for second-degree murder, a violation of La.Rev.Stat. 14:30.1 After review of the record in light of the applicable law and arguments of the parties, the defendant's conviction and sentence are conditionally affirmed, subject to a determination of the defendant's competency. Accordingly, the matter is remanded to the trial judge for a nunc pro tunc hearing in accordance with State ex rel. Seals v. State, 2000-2738 (La.10/25/02), 831 So.2d 828, and State v. Nomey, 613 So.2d 157 (La. 1993).

Relevant Facts and Procedural History
Shortly after midnight on New Year's Eve and in the early morning hours of January 1, 2005, Daniel Washington was murdered in front of his house at 1509 Marais Street in New Orleans. His next door neighbor (Camper) was initially indicted for first-degree murder but the indictment was subsequently amended and the defendant was charged with second-degree murder. The defendant pleaded not guilty and his subsequent motions to suppress the evidence and identification were denied on July 25, 2007.
In a three-day jury trial in October 2007, the following evidence was adduced. *575 Mrs. Casey J. Washington testified that she and the victim had been married about fifteen months and for approximately a year had lived with two young sons at 1509 Marais Street, next door to the defendant and his wife who lived at 1511 Marais Street. Her husband, an employee of the Red Fish Grill Restaurant in New Orleans, returned home from working the 4:00 p.m. to midnight shift shortly before his death. According to Mrs. Washington, she heard him arrive home a little past midnight, lock his bicycle to the fence, and wish people in the vicinity "Happy New Year." When he did not enter the house within a reasonable amount of time, however, she went to the front door to check on him. Upon opening the door, Mrs. Washington saw her husband lying on the steps with head and chest wounds and the defendant standing approximately a foot from his head. She briefly tried to revive her husband but when she saw the defendant with a gun, she ran. As she ran, she hear three or four gunshots which she assumed were fired at her. She saw the defendant get in his truck and leave. Shortly thereafter, Mrs. Washington identified the defendant as the shooter from a photo identification compiled by Detective Jimmi Turner of the New Orleans Police Department (NOPD). According to Mrs. Washington, her husband was unarmed on the night of his murder.
A resident of 1507 Marais, Fletcher Johnson, also testified. Johnson stated that on the night of the murder, he was fifteen years old and standing on the front porch of his residence when the victim returned home on his bicycle shortly after midnight. As Johnson watched, the victim parked his bike and then "got into it" with the defendant, berating the defendant for throwing a firecracker near his front door because his children could have been in the vicinity. Johnson testified that he saw the defendant cock his gun and shoot the victim in the chest and then, as the victim fell to his knees on his front steps, walk up to the victim and shoot him a second time, this time in the head. Johnson stated that he did not hear the victim say anything after being shot, denied seeing any aggressive behavior by the victim toward the defendant, and asserted that the victim was not armed. Johnson testified that he retreated into his house after the second shot was fired and that he spoke to the police on the night of the murder, as well as on other occasions, identifying the defendant as the shooter. In addition, Johnson identified the defendant in court as the man who shot the victim.
Ms. Pearl Thomas, Washington's older sister, confirmed that her brother and his family lived at the Marais Street address for approximately one year prior to the shooting. According to Ms. Thomas, her last conversation with the victim occurred very early New Year's Day when he wished her happiness for the New Year. Later on New Year's Day, she was informed of his death by the victim's wife.
Lieutenant Dwayne Scheurmann testified at trial that he responded to the shooting at 1509 Marais Street in the early morning hours of January 1, 2005. He found the victim bleeding heavily from gunshot wounds, called for emergency assistance before directing other officers in securing the scene, photographing the scene, collecting evidence and contacting witnesses. After securing the scene, Lieutenant Scheurmann entered the defendant's residence to check for other possible victims and to preserve potential evidence. He observed state motor vehicle documentation on a truck registered in the defendant's name and, because he had been informed the defendant fled the area in his truck, took the documentation to broadcast the information to the authorities in case they came in contact with the defendant. *576 Neighbors at the scene identified the defendant as the shooter. Police did not receive any information from witnesses at the scene that the victim was armed at the time of the shooting, nor did they recover the murder weapon.
Officer Meredith Acosta, a NOPD firearms examiner at the time of the shooting, analyzed the three 9-millimeter cartridge cases recovered at the scene and the bullet and bullet fragments recovered during the autopsy performed on the victim's body. Her testing proved that the cartridge casings were fired by the same weapon. However, the bullet fragments obtained from the autopsy were unsuitable for caliber identification and firearms comparison purposes. Officer Acosta was not able to link the casings or fragments to a particular weapon because none was provided to her.
The parties stipulated that Terese Smith, if called as a witness, would testify in her capacity as a crime scene technician that she photographed the scene, collected ballistic evidence and retrieved the victim's belongings at the direction of Detective Jimmi Turner.
Detective Turner testified that when he arrived on the scene of the shooting, he spoke with other officers who began the investigation, as well as to the victim's wife and Fletcher Johnson at the murder scene and, subsequently, at headquarters in formal interviews. Detective Turner also interviewed the defendant's stepson, Alonzo Birch, Alonzo's girlfriend, Ms. Joyce Birch, and the defendant's wife, Mrs. Evelyn Camper. From those recorded interviews, Turner obtained a photograph of the defendant for confirmation identification purposes. After receiving the photo, Detective Turner requested a warrant for the defendant's arrest. The defendant was arrested approximately a year later.
Dr. Sarah Deland, a board certified forensic psychiatrist, testified on behalf of the defense. Dr. Deland testified that, according to her review of the coroner's report, the victim was legally intoxicated and under the influence of sedative medications at the time of his death. She stated that while the alcohol and controlled substances ingested by the victim generally act as sedatives, in combination those substances can act as disinhibitors, i.e., causing behavioral disturbance, inability to make rational judgments, and/or prompting a person to do things he or she would not ordinarily do.
Pat Kent, a psychotherapist specializing in substance abuse, also testified for the defense, stating that a person under the effects of alcohol and anxiolytic drugs, such as Valium, Xanax and benedryl, could become agitated.[1]
The defendant, a fifty-five year old grandfather, testified on his own behalf. He had two prior felony convictions, a 1990 aggravated battery conviction and a 1994 simple battery conviction. A pipe-fitter by profession, the defendant had been married approximately twenty years and had lived with his family without incident on Marais Street for approximately four years prior to the shooting. Although he got along well with his other neighbors, he and the Washington's had conflicts over the fence he and the landlord put up in the common backyard of 1509-11 Marais Street. In addition, the defendant testified that he observed Washington selling drugs in the neighborhood to both teenagers and adults from his stash of drugs near the fuse box of the Marais Street house. The defendant also observed Johnson selling drugs with Washington but when he *577 confronted Johnson about his actions, Johnson boasted that he could get any criminal charge thrown out. According to the defendant, he had called the police fourteen times to report Washington's drug dealing but the police never arrested him.[2] In one specific incident, a conflict arose between the two men when the defendant changed a fuse in his fuse box which was located on the Washingtons' side of the duplex next to the Washington's fuse box. After Mrs. Washington apparently reported to her husband that he had changed a fuse, Washington confronted the defendant, yelling obscenities, brandishing a gun, and threatening to shoot him. Although the defendant called the police, they took no action and later that night the defendant's truck was riddled with bullet holes.
The defendant testified that he shot Washington because he feared for his and his family's safety based upon the Washington's past behavior toward him and drug dealing. According to the defendant, Washington arrived home talking loudly and acting crazy on the night of the shooting. When the defendant's granddaughter lit a firecracker, Washington accused the child of throwing it at him and began arguing with the defendant's son, Alonzo. When Washington began to wave his gun in the air, the defendant's wife went into their house and retrieved a gun which she had purchased unbeknownst to the defendant. His wife handed him the gun to enable him to protect the family and, at that point, Washington raised his gun as if to shoot the defendant or a family member. The defendant shot him and then, because Washington attempted to raise his gun after the first shot, he shot him a second time. According to the defendant, neither Johnson nor Mrs. Washington were eyewitnesses to the shooting because neither was outside at the time. Because he was afraid of retribution from Washington's drug dealing friends in the neighborhood and because, despite his complaints, he had received no police protection or help in the past, the defendant fled the area.
On October 25, 2007, the jury returned a verdict of guilty as charged and on November 15, 2007, the defendant was sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence. That same day, a motion for a new trial was filed and denied and a motion for appeal was granted.

Assignment of Error No. 1
The defendant first argues that the trial court erred in denying his motion for a mistrial when the State negated his defense and tainted the trial in its opening statement by telling the jury that they would hear that the victim begged for his life and that the defendant's family told the defendant not to shoot, even though no evidence was produced at trial to support these statements.
A mistrial is a drastic remedy, warranted only when an error at trial results in substantial prejudice and effectively deprives the defendant of a fair trial. State v. Edwards, 420 So.2d 663, 679 (La. 1982). "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." State v. Jones, XXXX-XXXX, p. 19 (La.App. 4 Cir. 12/15/04), 891 So.2d 760, 774 (citing State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183). In accordance with Article 766 of the Louisiana Code of Criminal Procedure, the State's *578 opening statement is designed to "explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." La.Code Crim. Proc. art. 766; see State v. Green, 343 So.2d 149, 151 (La.1977) (the prosecutor's opening statement, designed to inform the jury so that they may understand the evidence as it unfolds and to protect the defendant from surprise, is not evidence and has no probative force). Therefore, because proof frequently falls short of professional expectations, misstatements of the evidence or references to evidence later ruled inadmissible in opening remarks generally does not serve as a ground for a mistrial absent bad faith on the part of the prosecutor or clear and substantial prejudice. Green, 343 So.2d at 151; see also State v. Gray, 542 So.2d 684, 686 (La.App. 4 Cir.1989) (when there is sufficient evidence to connect the defendant with the crime independent of the reference in the opening statement, the prosecutor's reference to inadmissible hearsay in an opening statement is not reversible error); State v. Scott, 454 So.2d 851, 853 (La.App. 5 Cir. 1984) (opening statement that police officer would testify that he used a license plate number to determine that the getaway vehicle in an armed robbery belonged to the defendant was not reversible error even though the license plate number was never introduced into evidence); Clark v. Blackburn, 605 F.2d 163, 165 (5th Cir. 1979) (citing Green, supra, to hold that under Louisiana law, failure to prove a part of the prosecution's opening statement does not constitute grounds for reversal).
The record indicates that during its case in chief, the State attempted to elicit testimony from Johnson that Washington made a verbal statement after he was shot, but Johnson testified that Washington said nothing. With regard to the claim during opening statement that the defendant's family told him not to shoot Washington, the defendant fails to show bad faith on the part of the prosecutor or that clear and substantial prejudice resulted from these unsubstantiated remarks. Moreover, the record contains sufficient evidence of the defendant's guilt, including his own testimony that he shot the victim twice and the corroborating eyewitness testimony of Johnson.
Next, the defendant argues that the trial judge mischaracterized key testimony and thereby impermissibly commenting on evidence in front of the jury. La.Code Crim. Proc. art. 772 provides:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
This no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. State v. Hodgeson, 305 So.2d 421, 430 (La.1974). Thus, if the effect of a comment is to permit a reasonable inference that it expresses or implies the judge's opinion as to the defendant's innocence or guilt, this constitutes a violation of the defendant's statutory right to no-comment and thus requires reversal. State v. Green, 231 La. 1058, 93 So.2d 657, 659 (1957). To constitute reversible error, however, the effect of the improper comment must be such as to have influenced the jury and contributed to the verdict. State v. Johnson, 438 So.2d 1091, 1102 (La.1983).
In this case, the defendant argues that the discrepancy between the testimony of Mrs. Washington and the eyewitness (Johnson) as to whether Washington was *579 wishing his neighbors "Happy New Year" as he arrived home is a determinative element of whether Washington or the defendant was the aggressor in the argument preceding the murder and, therefore, a key issue in whether the defendant acted in self-defense. The defendant maintains that the State's numerous objections during defense counsel's cross-examination of Johnson on this point prompted the trial judge to impermissibly comment on the testimony.
A review of the record indicates that in the State's case-in-chief, Mrs. Washington testified that she heard her husband wish someone "Happy New Year" as he made his way to the porch of their house. The testimony the defendant complains of occurred during the following colloquy during cross-examination of Fletcher Johnson:
Q. Did you ever hear [the victim] say Happy New Year to [the defendant] like in a friendly short of way?
A. I don't know.
Q. You've got to answer yes or no.
A. I don't recall.
Q. What?
A. I don't recall.
* * *
Q. Did you ever hear, like his wife heard him, wishing everyone a Happy New Year?
Prosecutor: Objection, Your Honor, only in that he's asked five questions. The witness has said he doesn't know.
* * *
By the Court. Actually he's already answered the question and he said he did hear it, Mr. Smith [defense counsel]. But I'll allow you to ask him again.
* * *
Q. And you didn't see [the victim] having any sort of conversation with other people when he got off of his bike?
A. They started arguing, his wife 
Q. No, no, before the argument.
A. I don't recall.
Q. What?
A. What other people?
Q. Yeah, like other neighbors, friends.
A. Somebody stopping and talking?
Q. Happy New Year, how are you doing? How's life?
A. I don't recall.
Although the trial judge's remark is problematic, counsel for the defense failed to object to the trial judge's remark and, thus, this issue has not been preserved for appellate review. La.Code Crim. Proc. art. 841(A).
The defendant also complains that the State used inadmissible hearsay to bolster Washington's character, allowing his sister to testify about his work history, that he drank champagne at work on the night of the shooting, and that he had been honorably discharged from the military. Notably, however, it was defense counsel who elicited this testimony that the defendant now argues was inadmissible hearsay testimony. Moreover, even accepting that this testimony was inadmissible hearsay, the error was harmless in light of the evidence of the defendant's guilt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (error harmless when it can be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict); Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Next, the defendant contends that he was prejudiced when the State elicited testimony from Detective Turner which *580 referred to the defendant's post-arrest silence. A review of the record indicates that on direct examination, the State questioned Detective Turner about the defendant's arrest:
Q. Did you ever get a chance to talk to [the defendant]?
A. No, ma'am.
Q. Why?
Defense counsel: Your Honor, I would object.
By the Court: Sustained.
* * *
A. We received several anonymous calls via different people calling the station saying that the guy 
Defense counsel: Your Honor, I'm going to object for the third time and they keep asking eliciting [sic] and she's allow him to give hearsay testimony.
By the Court: No hearsay, Ms. [prosecutor].
Q. Did you attempt to interview him once he was brought in?
Defense counsel: Your Honor, once again, she's treading on a mistrial so badly I think she wants to mistry the case. Does she have to go to the side to be told the rules of court?
* * *
The Court: We don't need that editorial. Ask a question, please.
Q. My question was: Did [Detective Turner] ever attempt to interview the defendant once the arrest warrant was executed.
Defense counsel: I'd like to have a court ruling before I ask for a mistrial.
The Court: I'll allow that question. It is a yes or no answer.
A. No, ma'am.
The foregoing excerpt does not indicate that Detective Turner explicitly commented on the defendant's post-arrest silence, however, and there is no indication that the State attempted to focus on the defendant's post-arrest silence.
Next, the defense complains that two statements made by the prosecutor in closing argument were improper. In State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183, this Court set forth the standard for determining whether a prosecutor's remarks are so prejudicial as to warrant a new trial:
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-0123, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor's statements are *581 improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. Williams, supra; Ricard; supra.

Id., 2001-2087, p. 15, 828 So.2d at 1183.
First, the defendant argues that the following statement made by the prosecutor was prejudicial:
Now the defense talked to you a lot about the word rebuttal and the would've, could've, should've, all the things I could've done. I don't think that there's anyone here that believed for one second that you actually got the [sic] hear everything I wanted you to hear.
The defense objected to this statement, moving for a mistrial which was denied by the trial court.
The defendant also objected to the prosecutor's statement, "[I]'ve seen the `thrash the victim' defense before, it's nothing new. But it is horrible." The defense argued that the prosecutor was interjecting her "personal opinion" into her closing argument.
A review of the record shows that the prosecutor's argument, viewed in context, was a rebuttal to the argument presented by the defense, accusing the State of failing to call other witnesses. Insofar as the State was pointing out the theoretical availability of the witnesses to both sides, the argument was not improper. Even if the prosecutor exceeded the bounds of argument, the trial judge has broad discretion in controlling the scope of closing argument, State v. Prestridge, 399 So.2d 564, 580 (La.1981), and an appellate court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369. In this case, however, the defendant has not shown how the jury in this case was influenced by the alleged misstatements or how they contributed to the verdict. Moreover, credit should be accorded to the good sense and fair-mindedness of the jurors who heard the evidence presented during the trial. State v. Williams, 96-0123, p. 15 (La.1/21/98), 708 So.2d 703, 716. In light of the eyewitness testimony in this case, we do not find that the jury's verdict was the result of the argument made by the prosecutor, but rather a result of the evidence of defendant's guilt.
Finally, the defendant contends the trial court should have ordered a mistrial in both of these instances. However, the defense only urged a mistrial in the first instance and, in accordance with La. Code Crim. Proc. art. 770, a mistrial can only be ordered upon the motion of a defendant. Inasmuch as the defense failed to request a mistrial in response to the second alleged instance of improper closing argument, the issue has not been preserved for appellate review. La.Code Crim. Proc. art. 841; State v. Martin, 98-1507, p. 16 (La.App. 4 Cir. 4/5/00), 788 So.2d 1, 11.
For the foregoing reasons, we do not find merit in the arguments raised by the defendant in his Assignment of Error No. 1.

Assignment of Error No. 2
In his final assignment of error, the defendant argues that the trial court erred in failing to advise him of the prescriptive period for post-conviction relief under La Code Crim. Proc. art. 930.8.
Although the requirement that a trial court inform the defendant of the limitation period for filing an application for post-conviction relief is supplicatory and therefore does not bestow an enforceable right on an individual defendant, See La.Code Crim. Proc. art. 930.8; State ex *582 rel. Glover v. State, 93-2330, 94-2101, 94-2197, pp. 20-21 (La.9/5/95), 660 So.2d 1189, 1201, this Court favors notifying a defendant of his rights under La.Code Crim. Proc. art. 930.8, when the trial court failed to do so, by advising the defendant of such right in its written appellate opinion. State v. McDonald, 2002-2347, p. 2 (La. App. 4 Cir. 2/19/03), 841 So.2d 38, 39. Therefore, in the interest of judicial economy, the defendant is advised that La.Code Crim Proc. art. 930.8 generally requires that applications for post-conviction relief be filed within two years of the finality of a conviction.

Error Patent
We do, however, find a potential error patent on the face of the record. The docket master in this case indicates that the defense moved for a lunacy[3] commission on August 28, 2007,[4] and that a lunacy hearing was set and reset for September 6, 2007.[5] The docket entry for September 6, 2007, indicates that the defendant appeared with counsel and that he was interviewed by Dr. Deland but does not indicate that the trial court ruled on the defendant's capacity to proceed. The defense also provided notice of its intent to use a mental condition as a defense.[6]
Although La.Code Crim. Proc. art. 643 provides that the court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed, this is not to say that a trial court must order a full-blown sanity commission every time an issue of a defendant's mental capacity is raised. State ex rel. Seals v. State, 2000-2738, pp. 5-6 (La.10/25/02), 831 So.2d 828, 832. Rather, it is within the trial court's discretion to order that the defendant be examined by a single psychiatrist to satisfy the requirements of La. Code Crim. Proc. art. 643. Id. (citing State v. Berry, 391 So.2d 406, 411 (La. 1980). It is well established that "reasonable grounds" exist where one should reasonably doubt the defendant's capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense. Id. at p. 6, 831 So.2d at 833(citing Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) and State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 851.
However, although a full-blown sanity commission is not necessary, the failure to observe procedures to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. State ex rel. Seals, p. 6, 831 So.2d at 833; Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); State v. Rogers, 419 So.2d 840 (La.1982). The failure to resolve the issue of a defendant's capacity to proceed may result in nullification of the conviction and sentence under State v. Nomey, 613 So.2d 157, 161-62 (La.1993), or a nunc pro tunc hearing to determine competency retrospectively *583 under State v. Snyder, 98-1078, p. 30 (La.4/14/99), 750 So.2d 832, 854 (in certain instances, a nunc pro tunc hearing on the issue of competency is appropriate "if a meaningful inquiry into the defendant's competency" may still be had).[7] In such cases, the trial court is again vested with the discretion of making this decision as it "is in the best position" to do so. State ex rel. Seals, pp. 30-31, 831 So.2d at 855. Accordingly, in accordance with State ex rel. Seals and State v. Nomey, we remand this matter back to the trial court for a nunc pro tunc hearing.

Conclusion
The defendant's conviction and sentence are conditionally affirmed, subject to a determination of the defendant's competency.
AFFIRMED CONDITIONALLY; REMANDED.
BONIN, J., concurs and assigns reasons.
BONIN, J., concurs and assigns reasons.
I respectfully concur in the decision, but write relative to the "Error Patent" portion of it.
The trial court record indicates the trial judge never made a determination of the defendant's capacity "to understand the proceedings against him or to assist in his defense." La. C. Cr. P. art. 641. While the record does show that the trial judge set a competency hearing, the record is silent as to whether such a contradictory hearing was conducted, as required by La. C.Cr.P. art. 647.
Since the record shows the scheduling of the hearing,[1] we have treated this matter as an "error patent" in accord with State v. Nicholas, 587 So.2d 16, 17 (La.App. 3 Cir. 1991) and cases cited therein; La.C.Cr.P. art. 920(2).
Louisiana Code of Criminal Procedure article 642, entitled "How mental incapacity is raised; effect," sets out what should have been followed:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.

[Emphasis added]
Contrary to this codal mandate, further steps were taken in the criminal prosecution of the defendant, although his mental capacity is still at issue.
In order to ensure full procedural due process protection to the defendant, we have directed the trial court to conduct a retrospective competency hearing. Rather than proposing a reversal of the conviction, I have agreed to this disposition because (1) the minutes reflect Dr. Deland interviewed the defendant on September 6, 2007, (2) she testified at the trial that she *584 had conducted the interview,[2] and (3) the defendant himself testified at the trial.
Following the retrospective competency hearing, it appears that the trial judge may well be able to make a "meaningful" determination as to whether Mr. Camper was competent at the time of trial. Therefore, the trial court should proceed under State v. Snyder, XXXX-XXXX, p. 32 (La.4/14/99), 750 So.2d 832, 856:
If the trial court concludes defendant was competent, no new trial is required to be conducted ... If the trial court finds a meaningful inquiry cannot be had, or if it determines after the [nunc pro tunc] hearing that defendant was not competent at the time of his trial, defendant shall be entitled to a new trial. [Citations omitted]
NOTES
[1] Mr. Kent reviewed the victim's autopsy results which indicated the presence of Valium, Xanax, benedryl and alcohol in his system the night he was killed.
[2] No evidence appears in the record to either support or dispute this claim.
[3] Although the pertinent articles in the Louisiana Code of Criminal Procedure provide that the defendant's mental capacity should be raised by motion and that and for appointment of a sanity commission, in this case the record reflects that a motion for a lunacy hearing was filed and that the lunacy hearing was set and reset. Accordingly, our recital of the pertinent facts reflect what is in the record.
[4] There is no minute entry for August 28, 2007.
[5] The minute entry for September 6, 2007, indicates: "Dr. Deland interviewed the defendant." There is no indication as to the result of the interview.
[6] There is nothing in the record to indicate that the trial judge ruled on the notice.
[7] "A `meaningful' determination is possible `where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original ... proceedings.'" Snyder, at p. 31, 750 So.2d at 855. If a retrospective determination cannot be made, or if it is determined that defendant was not competent at the time of trial, the defendant shall be entitled to a new trial. Id.
[1] This is why we do not determine that the "defendant implicitly waived his right to have the motion heard." State v. Gowan, 96-488 (La.3/29/96), 670 So.2d 1222; State v. Dugas, 96-49 (La.App. 3 Cir. 10/9/96), 683 So.2d 1253, 1256.
[2] Dr. Deland, a forensic psychiatrist, testified at the trial on the merits on the effect of drugs and alcohol on the victim, and not about the defendant's mental capacity.