MICHAEL E. KIRBY, Judge.
 

 STATEMENT OF CASE
 

 The State charged Nathaniel Dowl, Jr. with three counts of filing false public records, violations of La. R.S. 14:133. He entered not guilty pleas and the trial court subsequently found probable cause to charge him with those offenses. Following a three day trial, the jury returned a verdict of guilty as charged on each count. The trial court sentenced Mr. Dowl to a total of ten years imprisonment at hard labor. The defendant filed a Motion for Appeal, which the trial court granted.
 

 
 *757
 

 STATEMENT OF FACT
 

 This case involves three parcels of real estate: 1) 8633 Zimple Street (Zimple property), owned by Robinson Ventures, LLC
 
 [1]
 
 ; 2) 8417 Panola Street (Panola property), owned by Mrs. Michelle Robinson; and 3) 3432 Livingston Street (Livingston property), owned by Mr. and Mrs. Oscar V. Poydras. The defendant filed “quit claim” deeds
 
 [2]
 
 in the public records for Orleans Parish with respect to each of the properties. He attached to each deed documents purporting Lto vest him with ownership of the properties. The Zimple and Livingston properties’ “deeds” implied transfers of ownership from the City of New Orleans to him, while the “deed” pertaining to the Panola property indicated that Mr. Dowl had purchased the property for one dollar. Through these fabricated claims of ownership, the defendant attempted to evict Mrs. Robinson and the Poydrases from their own property and prevented the Poydrases from rebuilding their Hurricane Katrina damaged property-
 

 Seven witnesses testified at trial.
 

 Detective Michael Kitchens
 

 Detective Michael Kitchens was assigned to the Economic Crime Division of the Orleans Parish District Attorney’s office at the time he investigated this matter. He met with Mrs. Michelle Robinson and Mrs. Oscar (Tracey) Poydras who explained that Mr. Dowl was filing liens against their properties then following up with quit claim deeds to falsely claim ownership of them. During his investigation, Detective Kitchens examined acts of sale and other documents, which showed that the victims were in fact owners of the properties when defendant filed the quit claim deeds. Detective Kitchens obtained copies of the bogus deeds and attached them to his report. He identified the quit claim deed for the Zimple property, filed April 26, 2006, which listed Ms. Barbara Dowl, the defendant’s ex-wife, as the purchaser; the quit claim deed for the Livingston property, filed May 2, 2006, which indicated Mr. Dowl purchased that property; and the deed for the Panola property, filed May 8, 2006,- which also listed the defendant as the owner. Mr. Dowl filed all of the quit claim deeds. Detective Kitchens obtained an arrest warrant charging the defendant with injuring public |3records and filing and maintaining false public records. The detective identified the defendant at trial.
 

 On cross-examination, Detective Kitchens admitted that he was not an attorney and that he learned about quit claim deeds from someone else. During his investigation he found out that Mr. Dowl had previously owned the three properties, but that at the time he filed the quit claim deeds, Mr. Dowl no longer had any ownership interest in them. Detective Kitchens never spoke to Mr. Dowl because he could not find him.
 

 Ms. Alison Kiefer
 

 Ms. Alison Kiefer is the Registrar of Notarial Records for the Parish of Orleans. For fifteen years she has overseen that office and all acts of sale, mortgages, and any other documents pertaining to real estate in Orleans Parish are recorded in her office. Ms. Kiefer explained the procedure for filing real estate documents and the methods used for retaining original documents. There is no way for her to verify the genuineness or truthfulness of
 
 *758
 
 any document. Ms. Kiefer knew the defendant only from visits he made to her office to file documents.
 

 The witness copied the documents at issue in this case, and testified that they were exact copies of the originals. She matched the purported quit claim deeds with her office’s ledger listing who actually filed them and determined that the defendant filed one “tax sale/quit claim” on April 26, [2006] and “[on] May 9, [2006], [the defendant] came and recorded two quit claims.”
 

 14Mr.
 
 Reginald Zeno
 

 Reginald Zeno is the Director of Finance for the City of New Orleans. His job entails handling the financial affairs of the City including tax collection. Mr. Zeno did not know Mr. Dowl prior to being apprised of the case. He reviewed the purported deeds to the Zimple and Livingston properties, which both state, in part:
 

 ... personally appeared: CITY OF NEW ORLEANS appearing herein THUR [sic] its duly authorized agent REGINALD ZENO, Chief Bureau of the Treasury of the City of New Orleans
 

 [[Image here]]
 

 Mr. Zeno had no knowledge of these documents; he did not engage in any negotiations with Mr. Dowl; and he had no business relationship with the defendant. Further, the witness said that his official title is not “Chief Bureau of the Treasury.” There is, he said, such an official but it is not him. Mr. Zeno has no authority to dispose of property owned by the City, which authority he thought rested with the Mayor. Mr. Zeno played no part in the creation of the deeds introduced by the State and has nothing to do with tax sales.
 

 Mr. Christopher Lund
 

 Mr. Christopher Lund is an Assistant City Attorney assigned to the Housing Law Department. His job encompasses overseeing properties adjudicated to the City at tax sales, i.e., monitoring sales from the City to a subsequent purchaser. Mr. Lund examined the “deeds” to the Zimple and Livingston properties and declared them not genuine and full of inconsistencies. Significantly, the “deeds” do not bear the signature of anyone on behalf of the City nor is there a signature by anyone purporting to convey the property represented by the “deeds”. Although the instruments are titled “Tax Sale”, neither is in the proper form for a tax sale. | sThey are purportedly signed by Reginald Zeno, who has no authority to dispose of property on behalf of the City. Finally, the City does not transfer adjudicated property by quit claim. The transfer is usually done by an act of sale or an act of donation, if the property is transferred to a non-profit entity, and such transfers are signed by the mayor.
 

 Mr. Walter O’Brien
 

 Mr. Walter O’Brien is the Finance Operations Manager for the Department of Finance, Bureau of the Treasury for the City of New Orleans. He is responsible for billing and collecting property taxes for the city. Mr. O’Brien conducted the annual tax sales of delinquent real estate properties for twelve of his thirty-seven years of city employment. Mr. O’Brien examined the Zimple property deed and verified that the document was not generated by his office, nor did the deed convey title to the property. Further, he noted that a document attached to the deed indicated that taxes on the Zimple property had been paid but his office’s records show that the taxes were not paid, but instead, written off by the city.
 

 Mr. Braden Robinson
 

 Mr. Robinson is married to Michelle Robinson and they reside at 8417 Panola Street, which he purchased in 1998. He has owned the property continuously. Mr.
 
 *759
 
 Robinson identified the act of sale' by which he acquired title to the Panola property. The Zimple property involved in this matter is owned by Robinson Ventures, a company he owns with his wife.
 

 Mr. Robinson first learned of Mr. Dowl’s attempt to wrest title to his residence in May 2006, when the Orleans Parish Civil Sheriff served him with an ^eviction notice. He identified a copy of that notice. The witness searched the public records to determine what was going on with his property and discovered a quit claim deed filed by the defendant. The deed indicated the defendant purportedly purchased the property from Mr. Robinson for one dollar. Neither he nor his wife signed that deed, had any knowledge of it, knew the defendant and did not sell the property to him for any price.
 

 Mr. Robinson and his wife, through Robinson Ventures, purchased the Zimple property from the city after the property had been expropriated. Prior to the purchase he went to the property to inform the owner about the pending sale. Mr. Robinson spoke with Mr. Dowl and told him that the property was to be sold at public bid for delinquent taxes and that it was listed on the city’s web site as being for sale. Mr. Dowl told Mr. Robinson that he was tired of the city interfering with his property. After Mr. Robinson purchased the property, the defendant squatted on it forcing Mr. Robinson to have him evicted. Mr. Robinson identified his tax payment receipts for the 2004, 2005 and 2006 taxes on the Zimple property.
 

 Mrs. Tracey Poydras
 

 Mrs. Poydras testified that in 2000 she and her husband acquired the Livingston property, which the city considered blighted, through the New Orleans Redevelopment Authority. As a condition of their acquisition they were required to timely repair the property and put it back into commerce. After paying the required appraisal fee Mr. and Mrs. Poydras toured the property which was just a shell. There were no walls, utilities or flooring. They purchased the property for ten thousand dollars and, since it was uninhabitable, they spent between sixty and seventy thousand dollars to renovate it. Ultimately, the Poydrases were able to rent |7the property to tenants. At no time were they ever delinquent on their taxes, mortgage or other bills related to the Livingston property. The property was damaged in Hurricane Katrina and as the Poydrases prepared to repair it they found the property affixed with no trespassing signs and surrounded with yellow caution tape. They removed the signs and tape but a week later, they were back in place on the property. Mrs. Poydras contacted the city about the situation and learned the city had not posted the signs or tape. In the course of her investigation, Mrs. Poydras linked this situation to
 
 k
 
 chain of events in 2004 when Mr. Dowl tried to evict the Poydrases and their tenants from the property by claiming ownership of it. She and her husband were forced to file suit to clear the title to the property.
 

 These post-Katrina events were a repeat of the pre-hurricane events: In May 2006, Mrs. Poydras “found a tax sale and quit claim deed attached to my property,” which had been filed by Mr. Dowl. By this time, the Poydrases had already fixed the roof and had supplied utilities to the property. The defendant then moved into the Livingston property. Because of Mr. Dowl’s unauthorized squatting, the Poy-drases were unable to rent the property. Eventually, they were able to secure a permanent injunction against Mr. Dowl. The Poydrases spent between thirty and forty thousand dollars in legal fees as a result of Mr. Dowl’s actions.
 

 
 *760
 

 ERRORS PATENT
 

 A review for errors patent on the face of the record reveals none.
 

 COUNSEL ASSIGNMENT OF ERROR
 

 The evidence is insufficient to support the conviction.
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Cummings,
 
 95-1377 (La.2/2896), 668 So.2d 1132. A reviewing court must consider the record as a whole, as would any rational trier of fact. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mussall, supra.
 
 A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.
 
 State v. Smith,
 
 600 So.2d 1319 (La.1992).
 

 In this case, the defendant was convicted of three counts of filing false public records, in violation of La. R.S. 14:133.
 
 [3]
 
 The elements of the crime of filing false public records are: (1) the defendant files or deposits for record in any public office or with any public official, (2) with knowledge of its falsity, (3) any Ipdocument containing a false statement or false representation of a material fact.
 
 State v. Odom,
 
 2007-0516 (La.App. 1 Cir. 7/31/08), 993 So.2d 663.
 

 As to the “filing” element of the offense, the State offered the testimony of Detective Kitchens and Ms. Kiefer. Both testified that the defendant filed the three quit claim deeds at issue in the Orleans Parish Notarial Archives. Ms. Kiefer explained that the Notarial Archives is affiliated with the government of the City of New Orleans; thus the State established that the defendant filed the quit claims deeds in a “public office.”
 

 Concerning the falsity element, the “deeds” to the Zimple and Livingston properties purported to be “tax sales” transferring those properties from the City to the defendant through Mr. Zeno as the City’s agent. However, Mr. Zeno testified that he had no authority to transfer City-owned property and he never authorized the sale of these properties to the defendant. Mr. Lund testified that the purported deeds were inconsistent with the manner in which the City transfers ownership of property. Also, the Zimple property “deed” contained information that property taxes had been paid from 1992 through 2005; however, Mr. O’Brien
 
 *761
 
 with the City’s Department of Finance refuted that information.
 

 With regard to the Panola property, Detective Kitchens testified that the defendant never had any ownership interest in that property. Mr. Robinson, who, along with his wife, owned the property, testified that neither he nor his wife ever transferred any interest in the property to anyone, notwithstanding that the “deed” filed by Mr. Dowl indicated that he had purchased the property for one dollar. Further evidence of the falsity of the documents filed by the defendant, was that his claim to ownership of the Panola property was based on a “lien”. Mr. Robinson testified that he did not owe the defendant any money and he never received notice |10of a purported indebtedness from the defendant prior to being served with a five-day notice of eviction.
 

 Accordingly, we find the jury was not unreasonable in concluding that all three “deeds” contained false statements — that the City transferred an ownership interest in those properties to the defendant; that the City taxes on the properties had been paid; and that Mr. Dowl purchased the Panola property for one dollar. There was also sufficient evidence to establish that the defendant filed the false documents.
 

 Finally, the evidence in this case proves the defendant knew the “deeds” he filed were false and that he could not legitimately claim ownership of the three properties. Although Mr. Dowl at one time did own the Zimple property, Mr. Braden Robinson purchased it from the City in a 2004 tax sale. Prior to purchasing the property, Mr. Robinson advised Mr. Dowl that he could redeem the property, however, Mr. Dowl took no such action. Instead, once the Robinsons purchased the property he continued living there forcing th'e Robinsons to have him evicted. Nevertheless, after his unsuccessful appeals of his eviction, Mr. Dowl filed into the public records a false tax sale claiming ownership of the Zimple property.
 

 Similarly, the defendant once owned the Livingston property; however, because the City deemed it blighted, the property went to public sale at which Mr. and Mrs. Poy-dras purchased it. In 2004, the defendant attempted to evict the Poydrases from the property. After lengthy and costly legal proceedings the Poydrases’ ownership of the Livingston property was confirmed. Yet, even after the legal proceedings rejecting Mr. Dowl’s claim of ownership, in 2006 he filed into the public records a false document purporting to evidence his ownership interest in the property.
 

 InConcluding, Mr. Dowl claimed ownership of the Panola property, the Robin-sons’ home, but unlike the Livingston and Zimple properties, Mr. Dowl had never owned it. The Robinsons never sold it to him, a fact he knew, nor did he ever have a lien on the property.
 

 The evidence shows that the defendant’s actions were an attempt to retaliate against the Robinsons and Poydrases for their purchases of the Zimple and Livingston properties. Based upon the evidence produced by the State, the jury was not unreasonable in concluding that the defendant knowingly filed false documents into the public records. This assignment is without merit.
 

 PRO SE ASSIGNMENT OF ERROR NUMBER 1
 

 In the first of four pro se assignments, Mr. Dowl argues that the trial judge committed reversible error by allowing the jury to examine written evidence during its deliberations. He contends this error was directly responsible for his conviction.
 

 La.C.Cr.P. art. 793 provides in pertinent part:
 

 
 *762
 
 A. Except as provided in Paragraph B of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
 

 The general rule expressed by La. C.Cr.P. art. 793 is that the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue that does not require the examination of the verbal contents of the document.
 
 State v. Perkins,
 
 428 So.2d 1103, 1109-1110 (La.1982).
 

 The record reflects that while the jurors were deliberating, they sent a note to the trial judge requesting to review the three quit claim deeds and lien. The defense objected on the basis of La. C.CrJP. art. 793. The State argued that La.C.Cr.P. art. 793 provides the trial judge discretion to allow the deliberating jury, “[access to] any object or document received in evidence when a physical examination thereof is required to aid the jury in arriving at its verdict.” The trial court heard arguments and allowed the jury to review the documents.
 

 In
 
 State v. Sellers,
 
 2001-1903 (La.App. 4 Cir. 4/10/02), 818 So.2d 231, this Court, citing
 
 State v. Freetime,
 
 303 So.2d 487 (La.1974) explained the rationale of La. C.Cr.P. art. 793:
 

 The policy choice thus represented [by art. 793] is to require jurors to rely on their own memory as to verbal testimony, without notes and without reference to written evidence, such as to depositions or transcribed testimony. The general reason for the prohibition is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them. However, such prohibition is contrary to the growing trend to permit discretion in the trial court, in the absence of a statutory prohibition, to accede to jury requests to see exhibits and writings (except depositions).
 

 Sellers,
 
 2001-1903, p. 7, 818 So.2d at 235-236.
 

 In this case, the trial judge reasoned:
 

 You know the general rule of law as we all know is that written documents do not go into the jury room. However as opposed to a cocaine case or a gun charge where there may be a written document and the best evidence is the testimony [sic]. The Court’s opinion [is] that S-1, S-2, S-3 [the quit claims and lien] are the corpus of the crime. In other words the counts rest and fall on the material that is contained within S-1, S-2 and S-3. And in light of the complexity of the case and the State’s theory on those counts that the entirety of the contents of S-l, S-2, S-3 respectively contain material misrepresentations and forgeries [sic]. The Court is going to send [those documents to the jury].
 

 In
 
 State v. Caston,
 
 40,093 (La.App. 2 Cir. 10/26/05), 914 So.2d 122, the defendant was convicted of the unauthorized use of a movable. The trial court allowed the jury to review during deliberations copies of checks introduced into evidence for the purpose of determining the authenticity of signatures. In support of the trial court’s ruling, the court in
 
 Caston
 
 cited dicta from
 
 State v. Perkins,
 
 423 So.2d 1103 (La.1982), which provided:
 

 
 *763
 
 The general rule as expressed by C. Cr. P. 793 is that the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. For example, a jury can examine a written statement to ascertain or compare the signature, or to see or feel it with regard to its actual existence.
 
 State v. Freetime,
 
 303 So.2d 487, 489 (La.1974). The legislature has made an express choice in this instance, and this court must follow the explicit prohibition of article 793, of jury access to written evidence during the deliberations, except for the sole purpose of physical examination.
 

 Caston,
 
 40,093, p. 13, 914 So.2d at 131.
 

 Like the checks in the
 
 Caston
 
 case, the quit claim deeds and lien at issue in this case, constitute, as the trial judge noted, “the corpus of the crime.” The documents were not testimony. They were not direct evidence of the defendant’s guilt, as that issue was proven by the State’s witnesses. The documents were not offered into evidence for their verbal contents but rather as physical evidence of their existence and to prove that the defendant filed them into the public records.
 

 . Nevertheless, even if the trial court’s action amounted to error, the erroneous presentation of written, documentary evidence to the jury during deliberations.is _|_ytrial error that can be quantitatively assessed in the context of other evidence, and therefore is subject to harmless error analysis.
 
 State v. Johnson,
 
 97-1519 (La. App. 4 Cir. 1/27/99), 726 So.2d 1126, 1134.
 

 The quit claim deeds in this case were introduced at trial and bore the signature of the defendant. The testimony of Detective Kitchens and Ms. Kiefer established that Mr. Dowl filed them and the lien into the public records. Mr. Zeno’s testimony confirmed that the deeds were false because he did not sign them and that he did not have authority to sell city property, as the deeds purport to do. Finally, the testimony of Mr. Robinson and Mrs. Poydras, plus the civil proceedings initiated by the Poydrases to resist the defendant’s attempt to evict them from their property, prove that the defendant knew he had no ownership interest in the properties represented in the subsequent deeds. The State’s uncontroverted evidence at trial clearly establishes that the guilty verdict was unattributable to trial error and that a violation of La.C.Cr.P. art. 793, if there was one, was harmless. This assignment has no merit.
 

 PRO SE ASSIGNMENT OF ERROR NUMBER 2
 

 By this assignment, the defendant argues that he was prejudiced by the trial court allowing a contested juror to remain in service on the jury.
 

 During trial, a juror explained to the trial judge that he recognized the maiden name of one of the victims:
 

 I recognized a name ‘Michelle Thibo-deaux Robinson.’ When you all asked the names prior I think I just heard Michelle Robinson. But then when I looked at the document, I saw Michelle Thibodeaux Robinson. I’m a High School Band Director. And I had a Michelle Thibodeaux in my band about fifteen years ago. So, I don’t know if that’s her or not.
 

 |1BThe defense moved for a mistrial on the basis of the juror’s possible acquaintance with one of the victims.
 

 A mistrial is a drastic remedy, warranted only when an error at trial results in substantial prejudice and effectively deprives the defendant of a fair trial.
 
 State v. Edwards,
 
 420 So.2d 663, 679 (La.
 
 *764
 
 1982). “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.”
 
 State v. Camper,
 
 2008-0314 (La.App. 4 Cir. 10/1/08, 996 So.2d 571).
 

 The following colloquy occurred between the trial judge and juror in this case:
 

 Judge: You don’t know if it’s her or not.
 

 Juror: No, because I haven’t seen her. I would know her if I were to see her.
 

 Judge: All right. Let me just ask you, just in the abstract Thibodeaux is a fairly common name as is Robinson. And I don’t know either. Just say even if you had directed her in the band back in high school, would that make a difference to you one way or the other?
 

 Juror: No, it would not.
 

 Judge: Do you feel that one side or the other is at an advantage or disadvantage in this case?
 

 Juror: Not at all.
 

 Judge: And Mr. Jackson, do you feel that you are as fair and impartial at this point in your jury service maybe recognizing the name as someone you may know as opposed to when you first started the trial? Do you still feel the same fair and impartial?
 

 Juror: Still feel the same, your Honor.
 

 11fiBased on the foregoing exchange, the trial judge denied the Motion for Mistrial, noting:
 

 ... We don’t know that it’s the Michelle Thibodeaux Robinson that Mr. Jackson is reference (sic) at all. It is a fairly common name and most importantly, to this Court, observing Mr. Jackson’s demeanor throughout this whole trial, I believe that he is mature in both his approach to his jury service and his answers to my questions about whether or not that would impact him or influence him in any way. He is very adamantly and decisively of the mind that this would not and could not impact his ability to be a fair and impartial decision maker in this case. And that he is not at all disposed to one side or another in his view of this case.
 

 Disclosure during the trial that a juror knows a witness, including the victim, does not necessarily prevent a fair trial. The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict.
 
 State v. Meriwether,
 
 412 So.2d 558, 560 (La.1982). In
 
 Meriwether,
 
 the Louisiana Supreme Court was presented with the same issue. After trial had begun, the trial judge was notified that a juror was acquainted with the victim:
 

 On the morning of the third day of trial and after the victim had testified on the previous day, the trial judge informed defense counsel and assistant district attorney that a Ms. Mona R. Verrette, one of the jurors, had come to his chambers that morning and told him that she was acquainted with the victim although on voir dire she stated that she did not know her. When the jurors were questioned on voir dire regarding knowledge, of the victim, the victim’s married name, as it' appeared in the indictment, was used. Since Ms. Ver-rette knew the victim only by her maiden name, she did not realize she knew [the victim] until [the victim] was called to testify. The judge further informed both counsel that the juror told him that she had gone to school with the victim and saw her regularly at Randy’s supermarket where the victim was employed and at Hardy’s where the juror was employed. The judge additionally stated that he had questioned Ms Verrett as to whether she had a fixed opinion as to
 
 *765
 
 the guilt or innocence of the accused and she replied that she did not. He also asked her “if she 117could decide the case, putting aside her acquaintanceship with the victim; decide the case strictly on the evidence that she hears in the courtroom and the law as I explain it to her at the end of the trial, and she replied that she could do that.”
 

 Id.
 
 at 560.
 

 The
 
 Meriwether
 
 court deemed the defendant’s argument of error “without substance” and ruled:
 

 While Ms. Verrette inadvertently made a false statement during voir dire, there is no showing that the acquaintance between the victim and Ms. Verrette was such as would prevent defendant from receiving a fair trial. There is no reason to believe that merely because Ms. Verrette and the victim knew each other when they were in school and patronized the other’s place of employment it would influence the juror in arriving at a verdict. Moreover, when questioned by the trial judge, Ms. Verrette indicated that she could put aside her acquaintance with the victim and decide the case strictly on the evidence and the law as explained to her by the judge. Under the circumstances, we are unable to say that the trial judge abused his discretion in failing to order a mistrial.
 

 Id.
 
 at 560-561.
 

 A comparison of the facts of this case with those of
 
 Meriwether
 
 evidence less potential prejudice to the defendant in this case. In
 
 Meriwether,
 
 the juror actually knew the victim. They attended school together and patronized each other’s places of employment. In this case, the juror was not certain that he knew the victim, and there was no indication that he had any contact with her in the past fifteen years. Like the
 
 Meriwether
 
 juror, the juror in this case said his acquaintance with the victim, if any, would not affect his ability to decide the case fairly and impartially. The trial judge did not err in denying the Motion for Mistrial. This assignment has no merit.
 

 \wPRO SE ASSIGNMENT OF ERROR NUMBER 3
 

 In a third assignment, the defendant contends the trial judge erred in denying his Motion to Quash the Bill of Information pursuant to La.C.Cr.P. arts. 484 and 485.
 
 [4]
 
 The defendant maintains
 
 *766
 
 that the State failed to provide an adequate Bill of Particulars because the State’s Answers to the Bill of Particulars failed to identify the alleged forgery and/or misrepresentation of material facts in the quit claim deeds.
 

 In
 
 State v. Barrow,
 
 98-0374, p. 4 (La. App. 4 Cir.11/25/98), 724 So.2d 268, 265, this court stated:
 

 In criminal prosecutions, ‘an accused shall be informed of the nature and cause of the accusation against him.’ La. Const. Art. I, § 13. The bill of particulars provided for in Article 484 of the Code of Criminal Procedure is a means by which a defendant is so informed.
 
 State v. DeJesus,
 
 94-0261, p. 3 (La.9/16/94), 642 So.2d 854, 855. While the bill of particulars is not a means for the defendant to obtain the State’s evidence, it should inform of the essential facts of the crime charged.
 
 Id.
 
 Therefore, if the trial court determines that the bill of information and/or bill of particulars is insufficient, it may quash the charges. La.Code Crim. Proc. Ann. art. 485.
 
 DeJesus, supra.
 
 An appellate court reviews such a ruling for abuse of 119discretion.
 
 State v. Atkins,
 
 360 So.2d 1341, 1344 (La.1978),
 
 cert. denied,
 
 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979);
 
 State v. Ross,
 
 561 So.2d 1004, 1007 (La.App. 4th Cir.1990), writ denied in part, not considered in part, 594 So.2d 885 (La.1992).
 

 The Bill of Information in this case charges the defendant with three counts of filing false public records in violation of La. R.S. 14.T33 to wit: quit claim deeds for the properties located at 8417 Panola Street, 8633 Zimple Street and 3432 Livingston Street.
 

 In response to the defendant’s Motion to Quash, the State specified what constituted the forgery and/or misrepresentation of material facts elements of the defendant’s actions:
 

 The quit claim deed itself is not fraudulent. What is fraudulent are the attachments to the quit claim deed, i.e., two false tax sales and a false RICO lien, filed into the public records as a part of quit claim deed which give the defendant’s actions an aura of authenticity but are in fact the tools that the defendant used to perpetrate a fraud on the several sections of Civil District Court as well as the Recorder of Mortgages and the Notarial Archives.
 

 See State’s Response to Defendant’s Memorandum to Quash, Rec. Vol. 1, p. 154.
 

 Mr. Dowl herein was accused of filing false public documents. Those documents were provided to the defendant. The reasons underlying the State’s belief in the fraudulent nature of those documents were identified. Specifically, at no time during the trial did the defendant claim to be surprised by the charges against him. The Bill of Information and the State’s Answers to the Bill of Particulars were sufficient to inform the defendant of the nature and cause of the accusations against him in enough detail to allow him to prepare for trial. This assignment has no merit.
 

 haPRO SE ASSIGNMENT OF ERROR NUMBER 4
 

 In a final pro se assignment of error, the defendant argues that his sentence of ten years is excessive for “these non-violent, white collar crimes.”
 

 Article 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive or unusual punishment.” A sentence, although within the statutory limits,
 
 *767
 
 is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless and needless imposition of pain and suffering.”
 
 State v. Caston, 477
 
 So.2d 868, 871 (La.App. 4 Cir.10/11/85).
 

 La.C.Cr.P. Art. 894.1 sets forth the criteria for sentencing. The trial court need not articulate every cited circumstance, but must indicate that it considered the 894.1 guidelines in tailoring a particular sentence to a particular defendant convicted of a particular crime.
 
 State v. Guiden,
 
 399 So.2d 194 (La.1981). Both the aggravating circumstances and the mitigating circumstances must be considered,
 
 State v. Franks,
 
 373 So.2d 1307 (La.1979), and the court must state the factual basis underlying its conclusion.
 
 State v. Saunders,
 
 393 So.2d 1278 (La.1981). Accordingly, the sentencing record must reflect that the trial judge considered the personal history of the defendant in addition to the seriousness of the crime and the past criminal history of the defendant.
 
 State v. Quebedeaux,
 
 424 So.2d 1009 (La.1982).
 

 If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case.
 
 State v. Caston, 477
 
 So.2d at 871.
 

 Inconsecutive sentences are appropriate when a defendant is convicted of distinct offenses, i.e., those affecting different victims at different times and at different locations.
 
 State v. Brooks,
 
 2000-2337 (La.App. 4 Cir. 4/10/02), 817 So.2d 288, citing
 
 State v. McCray,
 
 28,531 (La.App. 2 Cir. 8/21/96), 679 So.2d 543.
 

 In this case, the trial judge considered the pre-sentence investigation report, victim statements, the facts of the case and sentencing guidelines contained in La. C.Cr.P. art. 894.1, specifically citing each component of the guidelines. The trial judge noted:
 

 ... [The presentence report in this case] notes a criminal history dating back to 1976, with a conviction for theft in 1977, 90 days Orleans Parish; July of 1978, possession of Valium, conviction under case number 265-907, Section “F”, one year Department of Corrections, two years of active probation; September 12, 1983, charged felon with a firearm, case number 298-576, Section “G”, that charge dismissed, nolle prosequied, on February 24, 1989; arrests from Houston, Dallas, Baton Rouge, Philadelphia, Pennsylvania; with the next conviction occurring in 1985, April 26, 1985, U.S. Attorney, Washington D.C., attempted unauthorized use of a movable and receiving' stolen property, with a plea of guilty on November 25, 1985, to one year hard labor; a 1986 arrest out of Baton Rouge for aggravated burglary, felony théft, and attempted second degree murder, charges dismissed.
 

 Next conviction, May 22, 1986, Houston, Texas, felony theft and larceny, plea of guilty, two years hard labor; January 27, 1988, St. Louis, Missouri, forgery, two counts, dismissed, July 24, 1991; April 6, 1988, Orleans Parish, case number 327-403, Section “G” of this court, forgery, thirteen counts, sentenced in May of 1990 to 3 years Department of Corrections, suspended, 3 years of probation, probation revoked in 1992; February 1994, Orleans Parish, charges of forcible rape, impersonating a police officer, charges refused, March of 1994; January 28, 1997, Orleans Parish, possession of marijuana first offense, case number 389-216, Section “D”, pled guilty on June 26, 1997, one year inactive probation; June 5, 1999, Orleans
 
 *768
 
 Parish, possession of marijuana second offense, case number 408-272 Section “C”, pled no contest, November 10,1999, 30 days Orleans Parish ^Prison; April 19, 2000, Orleans Parish, possession of marijuana third offense, case number 414-328, Section “B”, charges nolle pro-sequied on August 9, 2000; May 19, 2000, Orleans Parish, possession of marijuana first offense, Orleans Parish, as number 416-307, Section “A”, pled guilty on March 13, 2001, suspended sentence, inactive probation; April 26, 2003, Orleans Parish, possession of marijuana first offense, case number 438-402, pled guilty on August 22, 2003, six months suspended sentence, one year inactive probation; July 24, 2004, Orleans Parish, possession of marijuana second offense, case 451-082, Section “J”, pled guilty May 21, 2007, suspended sentence, one year inactive probation; the instant offense, August 30, 2007, filing a false public record, three counts, and June of 2008, possession of marijuana as a third offender, case 479-404.
 

 ... The Department of Corrections classifies [the defendant] as a sixth felony offender.
 

 The Court would also note that while out on bond for this case, [the defendant] did test positive for marijuana ...
 

 Sentencing ... [on], case 479-404, the State of Louisiana amended this bill of information to a misdemeanor. He was found guilty at trial. The Court sentences [the defendant] to 6 months Orleans Parish Prison, credit for time served and concurrent in case 479-404.
 

 The felony charge, case 474-843, relative to three counts of filing a false public record. This Court does not need to reiterate the factual basis that the jury heard before returning their verdict of guilty as charged. This trial took several days, involved quite complicated testimony from a variety of different agencies, both state and local, and from the victims in this case, as well.
 

 The record reflects that Mr. Dowl has a lengthy criminal record spanning three decades and five states. The sentencing transcript reflects the trial judge properly fashioned his sentence. Although he received the maximum sentence on each count, the trial court could have required that all of the sentences be served consecutively (different incidents). However, the court allowed two of the | ^sentences to be served concurrently and one sentence be served consecutively. Consequently, the defendant received an aggregate sentence of ten years rather than the maximum of fifteen years. Moreover, in
 
 State v. Williams,
 
 2007-1111 (La.12/7/07), 969 So.2d 1251, the Louisiana Supreme Court upheld the imposition of the maximum five year sentence for filing false public records. This assignment is without merit.
 
 CONCLUSION
 

 For the reasons stated we affirm Mr. Dowl’s convictions and sentences.
 

 AFFIRMED.
 

 [1]
 

 . Robinson Ventures, LLC is owned by Mrs. Michelle Robinson
 

 [2]
 

 . Trial testimony refers to these documents as "quick claim” deeds. This opinion, however, will refer to the documents as "quit claim” deeds.
 

 [3]
 

 . La. R.S. 14:133 provides in pertinent part: Filing or maintaining false public records
 

 A. Filing false public records is the filing or depositing for record in any public office or with any public official, or the maintaining as required by law, regulation, or rule, with knowledge of its falsity, of any of the following:
 

 (1) Any forged document.
 

 (2) Any wrongfully altered document.
 

 (3)Any document containing a false statement or false representation of a material fact.
 

 [[Image here]]
 

 C. Whoever commits the crime of filing • false public records shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars, or both.
 

 [4]
 

 . La.C.Cr.P. art. 484 provides:
 

 Bill of particulars
 

 A motion for a bill of particulars may be filed of right in accordance with Article 521. The court, on its own motion or on motion of the defendant, may require the district attorney to furnish a bill of particulars setting forth more specifically the nature and cause of the charge against the defendant.
 

 Supplemental bills of particulars or a new bill may be ordered by the court at least seven days before the trial begins.
 

 When a bill of particulars is furnished, it shall be filed of record and a copy of the bill shall be given to the defendant.
 

 La.C.Cr.P. art. 485 provides:
 

 Effect of inconsistent or limiting allegations of bill of particulars
 

 If it appears from the bill of particulars furnished under Article 484, together with any particulars appearing in the indictment, that the offense charged in the indictment was not committed, or that the defendant did not commit it, or that there is a ground for quashing the indictment, the court may on its own motion, and on motion of the defendant shall, order that the indictment be quashed unless the defect is cured. The defect will be cured if the district attorney furnishes, within a period fixed by the court and not to exceed three days from the order, another bill of particulars which either by itself or together with any particulars appearing in the indictment so states the particulars as to make it appear that the offense charged was committed by the defendant, or that there is no
 
 *766
 
 ground for quashing the indictment, as the case may be.